Chinyere JENKINS, et al., Plaintiffs,

v.

STATE OF MISSOURI,
et al., Defendants.

No. 77–0420–CV–W–RGC.

United States District Court,
W.D. Missouri,
Western Division.

March 25, 1997.

**1152**

Arthur A. Benson, II, Jamie Lansford, Jane McQueeny, Kathy Finnell, Gregg F. Lombardi, Benson and McKay, Kansas City, MO, for Plaintiffs.

John R. Munich, Deputy Attorney General, Michael J. Fields, Gregory J. Scott, Bart A. Matanic, John Jackson, Assistant Attorneys General, Jefferson City, MO, Alfred A. Lindseth, Rocco E. Testani, Sutherland, Asbill & Brennan, L.L.P., Atlanta, GA, for Defendant State of Missouri.

Mark A. Thornhill, Michael F. Delaney, John P. Jennings, Spencer, Fane, Britt & Browne, Kansas City, MO, for Defendant Kansas City, Missouri School District.

Scott Raisher, Fredrick Wickham, Brian P. Wood, Jolley, Walsh & Hager, P.C., Kansas City, MO, for AFT Local 691.

## OPINION AND ORDER

RUSSELL G. CLARK, Senior District Judge.

On April 26, 1996, the State of Missouri (State) filed a Motion for Declaration of Unitary Status, Dissolution of all Injunctions, and Relinquishment of Jurisdiction from the desegregation order previously entered by this Court. On May 21, 1996, however, the State and the Kansas City Missouri School District (KCMSD or District) entered into an agreement (Agreement) pursuant to which the State would pay $314 million in desegregation funding to the KCMSD over a three-year period. On July 3, 1996, the American Federation of Teachers (AFT) announced that it would join in the Agreement. Subsequently, on July 19, 1996, the State filed a Motion for Final Dismissal and Approval of Transition Plan Reflected in the Agreement Between the State, KCMSD and AFT. Upon final approval of the Agreement by this Court, and the payment of $314 million, the State would be entitled to an order dismissing the State from this action. The Agreement provides that the State would pay any further court-ordered payments in addition to the original $314 million. This Court increased the State's finding obligations by $6 million at the June, 1996 budget hearing. That would, therefore, bring the total to be paid by the State to approximately $320 million. The State has already paid $107 million for Fiscal Year 1997, leaving a net amount due under the Agreement of approximately $213 million. On August 14, 1996, the KCMSD filed a "Memorandum In Support of Its May 21, 1996 Agreement With the State Defendants and AFT." The KCMSD, therefore, while opposing the State's Motion for Unitary Status, agrees with the State that the Court should release the State from any obligations except those to which the State

has pledged itself in the Agreement. The AFT occupies the same position as the KCMSD, opposing the unitary status motion, while endorsing the Agreement. The plaintiffs contest both the State's Motion for Unitary Status and the Approval of the Agreement.

The Court held a hearing in Kansas City, Missouri for three weeks from January 13 through January 31, 1997 to hear testimony concerning the above motions. Evidence included testimony from a number of expert witnesses, KCMSD board members, administrators and teachers of the KCMSD, representatives of the Missouri Department of Elementary and Secondary Education (DESE), students who attend the KCMSD, and parents of KCMSD students. The Court has reviewed all the exhibits, testimony from the hearing, and post-hearing briefs. For the reasons set forth below, the Court will approve the Agreement between the State and the KCMSD, deny in part the State's Motion for Unitary Status, and grant in part the State's Motion for Unitary Status.

## I. Introduction

In 1977, members of the Kansas City School Board, the KCMSD, and plaintiff schoolchildren brought suit against the State and other defendants. Plaintiffs alleged that the State, the surrounding suburban school districts (SSDs), and various federal agencies had caused and perpetuated a system of racial segregation within the KCMSD. The Court realigned the KCMSD as a defendant and after a trial on liability, dismissed the federal agencies and SSDs, holding the State and the KCMSD jointly and severally liable.

In 1984, the Court instructed both the KCMSD and the State to prepare a plan to establish a unitary school system. *Jenkins v. Missouri*, 593 F.Supp. 1485, 1506 (W.D.Mo.1984). After directing the parties to focus their energies on schools with over 90% minority enrollment, the Court identified the purpose of public schools as furnishing "quality education" to its students. *Id.* This Court's first remedial order in 1985 identified educational achievement as a proper goal in a desegregation remedy. *Jenkins v. Missouri*, 639 F.Supp. 19, 24 (W.D.Mo. 1985). This Court found that there had been

a "system wide *reduction*" in student achievement in the schools of the KCMSD. The Court also quoted from *A Nation of Risk:*

> ALL, *regardless of race or class or economic status,* are entitled to a fair chance and to the tools for developing their individual powers of mind and spirit to the utmost. This promise means that all children by virtue of their own efforts, competently guided, can hope to attain the mature and informed judgment needed to secure gainful employment, and to manage their own lives, thereby serving not only their own interests but also the progress of society itself

*Id.* (quoting U.S. Nat'l Comm'n On Excellence In Education, A Nation At Risk: The Imperative For Educational Reform 1 (1983)) (emphasis added). Nearly twelve years later, as this Court re-examines the status of the KCMSD, these words bear repeating. As the gap between rich and poor widens, and racial divisions, once thought in the healing process, expose long-festering wounds to a public that cannot imagine the reality of being black in America, this Court warns not only the citizens of Kansas City, but also the entire country, that while this Court may be powerless to remedy societal ills, some action must come soon to give hope to these disenfranchised citizens before the chasm in America becomes so wide that it may not be crossed.

## II. Background

While the quality of education received by KCMSD students is at issue, an undercurrent runs through the pleadings of the parties: money—how much the State has spent during the course of the remedy and from what direction future funding will flow. This present proceeding had its birth in the Supreme Court decision of June, 1995. In that case, *Missouri v. Jenkins*, 515 U.S. 70, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (*Jenkins III* ), the Supreme Court strained legal reasoning to examine both the scope of the remedy and the voluntary interdistrict remedy prescribed by this Court. The Supreme Court concluded that this Court had exceeded its equitable powers. The *Jenkins III*

Court spoke at length concerning the cost of the remedial efforts undertaken within the KCMSD. "The total cost for these quality education programs has exceeded $220 million." *Id.* at ——, 115 S.Ct. at 2043. "Since its inception, the magnet school program has operated at a cost, including magnet transportation, in excess of $448 million." *Id.* "As of 1990, the District Court had ordered $260 million in capital improvements.... Since then, the total cost of capital improvements ordered has soared to over $540 million." *Id.* at ——, 115 S.Ct. at 2044. "The District Court's desegregation plan has been described as the most ambitious and expensive remedial program in the history of school desegregation.... As a result, the desegregation costs have escalated and now are approaching an annual cost of $200 million." *Id.* "The State, through the operation of joint-and-several liability, has borne the brunt of these costs." *Id.* at ——, 115 S.Ct. at 2045. The State defendants have contributed approximately $1.2 billion to the Kansas City Missouri School District. The KCMSD has expended over $600 million of its own funds, bringing the total cost of the desegregation effort to $1.8 billion.

Fueled by the victory before the Supreme Court, the State placed a motion before the Court in April of 1996 for a declaration of unitary status. If the Court would grant unitary status, however, in addition to the loss of the state-supplied desegregation funding, the court-ordered KCMSD tax levy would fall from $4.96 to the state-ordered minimum of $2.75. Voters in the KCMSD have not passed an increase of the tax levy since 1969. In addition to the loss of these tax revenues, the decrease in the tax levy would cause a further decrease in the amount received from the state-funding formula, which provides increased funding for districts with higher levies. This could amount to a decrease in funding of approximately $75 million per year, in addition to the elimination of the state desegregation funding, which is also $75 to $80 million annually. This would reduce the current KCMSD budget to about half of what it is now.

In May of 1996, a month after the State put forth its Motion for Unitary Status, the State and the KCMSD signed an agreement whereby the State would pay the KCMSD $314 million over a three-year period, dependent upon the State's release from further desegregation obligations and the jurisdiction of the Court. The Court, however, must approve the Agreement. If the Court approves the Agreement, it releases the State from further financial obligation but leaves in place the $4.96 court-ordered levy. All of the parties agree that removal of the court-ordered levy would result in "fiscal chaos."

The Court held a hearing beginning on January 13, 1997 concerning the State's Motion for Unitary Status and its Motion for Approval of the Agreement. The State believes that its massive contributions over the last eleven years should outweigh any constitutional harm imposed some thirty to forty years previously. Much of the evidence at the hearing centered around how much the State has paid over the course of the litigation and the financial turmoil that would ensue if the KCMSD was declared to be unitary. Post-hearing briefs from all of the parties contained many references to the funding issues. In a proposed order submitted with its post-hearing brief, the State included findings of fact and conclusions of law that supported the approval of the Agreement with the KCMSD but declined to rule on the issue of unitary status. A further State Brief supplied more details of the financial calamity that would ensue were the Court to declare unitary status. This leads the Court to believe that the State defendants do not really wish this Court to declare unitary status. Even the KCMSD, presumably the beneficiary of a return to local control, does not want this Court to grant the State's Motion for Unitary Status.

In a prior ruling in this litigation, the Supreme Court cautioned against the plaintiffs and the KCMSD holding the State hostage to ever-increasing expenditures. *Missouri v. Jenkins*, 495 U.S. 33, 76, 110 S.Ct. 1651, 1676, 109 L.Ed.2d 31 (1990) (Kennedy, J., concurring). In this current proceeding, however, this Court is not too sure that the KCMSD and the State are not collaborating to hold the KCMSD taxpayers hostage to a court-ordered levy—all of which has the ef-

fect of allowing either the voters of the Kansas City Missouri School District or the state legislature to avoid making difficult decisions about the financial support of the second largest school district in the state and one in which state-supported segregation had some egregious effects. The Court, however, must focus on the legal issues involved, in addition to the welfare of the Kansas City schoolchildren and the mandate of the Supreme Court to return the KCMSD to the control of state and local authorities as soon as possible-presumably whether they would like it or not *Jenkins III*, 515 U.S. at ——, 115 S.Ct. at 2056.

The shifting postures of the parties in this case mirror the change in direction that the Supreme Court has taken in recent years in their decisions regarding school desegregation. *See Board of Education v. Dowell*, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991); *Freeman v. Pitts*, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992); *Missouri v. Jenkins*, 515 U.S. 70, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995). No longer must the Court eliminate the vestiges of segregation "root and branch." *See Green v. County School Board of New Kent County*, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694,20 L.Ed.2d 716 (1968). Instead, the Court must only assess whether everything "practicable" has been done to eliminate the vestiges of the prior discrimination and further, the Court may grant unitary status in incremental stages. The clear standard articulated in recent unitary status cases by the Supreme Court requires that defendants must show that they have "complied in good faith with the desegregation decree since it was entered" and that the "vestiges of past discrimination have been eliminated to the extent practicable." *Jenkins III*, 515 U.S. at ——, 115 S.Ct. at 2049 (quoting *Freeman v. Pitts*, 503 U.S. 467, 492, 112 S.Ct. 1430, 1446, 118 L.Ed.2d 108 (1992)). Courts examine the factors identified in *Green* for remaining vestiges of the prior discrimination to determine if a school system has attained unitary status. *See Green*, 391 U.S. at 435, 88 S.Ct. at 1692. Thus, the Court should scrutinize the equality of student, faculty, and staff assignments, facilities, transportation, and extracurricular activities. *Id.*

Additionally, in *Jenkins III*, the Supreme Court directed this Court to:

(1) "decide whether the reduction in achievement by minority students attributable to prior *de jure* segregation has been remedied to extent practicable";

(2) identify the "incremental effect that segregation has had on minority student achievement or the specific goals of the quality education programs"; and

(3) apply the three-part test articulated by the Court in *Freeman v. Pitts*.

*Jenkins III*, 515 U.S. at ——, 115 S.Ct. at 2055. The test from *Freeman v. Pitts* requires the Court to consider the following questions:

[W]hether there been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

*Freeman*, 503 U.S. at 491, 112 S.Ct. at 1446. Having set forth the legal standards, the Court will consider the current status of the KCMSD, now in the twelfth year of its remedial plan.

### III. Unitary Status: Examining the Vestiges of the Prior Segregation

A. *History*

From the late 1950s until the mid–1970s, the KCMSD maintained schools that were identifiable by race: schools with a predominantly black enrollment had black teachers; black schools were often overcrowded even though under-utilized white schools were nearby; black schools had older and less useful books and equipment than white schools; black schools had fewer or inferior

libraries, science laboratories, and physical education facilities compared to white schools; black schools offered diluted educational programs, including fewer college preparatory courses (or none) compared to white schools; and the general physical condition of black schools was worse than the condition of white schools. Stipulation, February 21, 1984.

The State took positive actions that discriminated against blacks, contributed significantly to the dual housing market, which denied black families ownership in certain neighborhoods, and thus harmed blacks financially. *Jenkins,* 593 F.Supp. at 1503. The State engaged in a wide range of activities, both officially and unofficially that discriminated against blacks in their public and private lives, and placed the State's imprimatur on racial discrimination. *Jenkins,* 593 F.Supp. at 1503. These actions contributed significantly to the creation and maintenance of the racially discriminatory dual housing system in the KCMSD. *Id.* The many blacks who were harmed financially by the dual housing market were further harmed in the 1970s and early 1980s when inflation caused home equity to increase for most U.S. households. (Testimony of Hanushek, Tr. at 830). The financial discrimination of the dual housing market which denied blacks substantial growth in home equity deprived many black parents of KCMSD students of the household wealth they would have had but for the dual housing market. (Testimony of Hanushek, Tr. at 829–30).

### B. *Today*

The State has given approximately $1.2 billion to the KCMSD for remedial programs since 1985 to desegregate the District's schools. (State Ex. 81). Additionally, the KCMSD has contributed approximately $600 million of its own to desegregation funding. (State Ex. 82). The desegregation plan in Kansas City is by far the most expensive ever implemented in any school district. (Testimony of Rossell, Tr. at 189). Since 1986, the State and the KCMSD have spent over $488 million for the construction of new schools and renovation of existing schools. (State Ex. 74). Since 1985, 15 new schools

have been built and 54 schools have been completely renovated. (State Ex. 84). Many of its facilities can accurately be described as the finest in Missouri, if not the country. Order of July 30, 1993. A videotape tour of several schools introduced as evidence by the State at the hearing demonstrated that even those schools considered as aging have enjoyed a "facelift" and now provide a clean, pleasant environment for the students. (State Exs. 63A–D). The State's expert on magnet schools, Dr. Christine Rossell, stated she had never seen the level of resources that have been expended on magnet schools as in the Kansas City Missouri School District. (Testimony of Rossell, Tr. at 139). According to one expert witness, the equipment-student ratios in the KCMSD magnet schools were "truly phenomenal." (Testimony of Armor, Tr. at 426).

### C. *A Preliminary Issue: The Burden of Proof*

Plaintiffs and the KCMSD maintain that because the State violated the Constitution, the burden of proof rests on the adjudged constitutional violator to show the elimination of any vestiges of the prior discrimination. The State contends that while this might be true for a vestige of a racial imbalance, it does not apply to any educational vestiges, such as the achievement gap shown to exist between test scores of black and white students within the KCMSD. As support, the State cites several unitary status cases that, according to the State, shift the burden of proof back to the plaintiffs when the alleged vestige is an achievement gap. *See Coalition to Save Our Children v. State Board of Education,* 90 F.3d 752, 776–78 (3d Cir.1996) (burden of proof on plaintiff because alleged student achievement disparities that were raised in the unitary status hearing had not previously been identified as a vestige of *de jure* segregation); *School Board of the City of Richmond v. Baliles,* 829 F.2d 1308, 1310–11 (4th Cir.1987) (affirming the district court decision to shift the burden of proof to plaintiffs because the school district had already attained unitary status); *Oliver v. Kalamazoo Board of Education,* 640 F.2d 782, 810–11 (6th Cir.1980) (because school district had achieved unitary

status, burden of proof on plaintiffs regarding the achievement gap); *People Who Care v. Rockford Board of Education,* No. 89–C20168, 1996 WL 364802, at *73 & n. 146 (N.D.Ill. June 7, 1996) (refusing to extend burden shifting to achievement scores). *United States v. City of Yonkers,* 833 F.Supp. 214, 220 (S.D.N.Y.1993) (causation issue deferred, but court notes that burden of proof rests on defendant once constitutional infraction is established).

■ It is well established that once a court has found an unlawful dual school system, the plaintiffs are entitled to the presumption that current disparities are causally related to prior segregation, and the burden of proving otherwise rests on the defendants. *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 537, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979). "[A]fter past intentional actions resulting in segregation have been established ... the burden becomes the school authorities' to show that the current segregation is in no way the result of those past segregative actions." *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 211 n. 17, 93 S.Ct. 2686, 2699 n. 17, 37 L.Ed.2d 548 (1973). This presumption ends, however, once a school district has achieved unitary status. *Riddick v. School Board,* 784 F.2d 521 (4th Cir.), *cert. denied,* 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986).

All of the cases cited by the State, save one, do not support the position the State has taken. Only in *People Who Care*—a district court decision from Illinois—has a court made a distinction between who should properly bear the burden of proof based on whether the vestige was a racial imbalance or an achievement gap. This Court is not bound by another district court's interpretation of the legal analysis. A controlling distinction in the burden of proof analysis is first, whether a defendant has been adjudged to be a constitutional violator, and second, whether an educational vestige was originally identified when liability was found. The *Jenkins* litigation meets both of these threshold requirements. The State was found to be the primary constitutional violator and "quality education" was identified as a goal of the remedy. As to its Motion for Unitary Sta-

tus, the State, therefore, has the burden to prove that any achievement gap is not a vestige of the prior discrimination. However, the Court will note at this point that the State's responsibility has always been limited to the funding of the remedy, not the implementation. It is this distinction that allows the Court to find that while the State may not meet the burden of proof relating to a vestige of the prior discrimination, and is therefore denied unitary status as to the vestige, it is consistent to find the State has done everything practicable to eliminate the vestige because they have adequately funded it.

### D.  *Theories of Vestiges*

The plaintiffs and the KCMSD both presented evidence concerning the alleged remaining vestiges of the prior *de jure* segregation. Plaintiffs and the KCMSD contend an achievement gap exists between the test scores of black and white students. Testimony at the hearing often touched on the effect of "low expectations" and the intergenerational effect of segregation upon the achievement gap. The State argues that while an achievement gap exists, it persists throughout the state and the country, and is a product not of race, but poverty. Plaintiffs and the KCMSD also maintain the KCMSD continues to display signs of racial isolation, pointing to the number of schools that still have over a 90% minority enrollment. Finally, the KCMSD charges that what it refers to as a "financing vestige" has never been eliminated. The KCMSD alleges that because voters within the KCMSD have not approved a school tax levy since 1969—"dating from precisely the moment when the school district became majority black"—court supervision cannot be withdrawn until alternative sources of funding are assured.

### 1.  The Achievement Gap

While the Supreme Court instructed this Court to "sharply limit" its reliance on the comparison of the students within the KCMSD to "national norms," *Jenkins III,* 515 U.S. at ——, 115 S.Ct. at 2045, the witnesses for all parties agreed that, as measured by scores on standardized achievement

tests, a gap exists between the test scores of black and white children *within* the KCMSD, irrespective of any nationwide comparison. Further, these test scores are the only tools for any historical comparison because that is what the KCMSD has available for analysis. (Testimony of Trent, Tr. at 1275).

Dr. David Armor, the State's expert, testified that this achievement gap was about 10 normalized curve equivalents (NCEs). (Testimony of Armor, Tr. at 446). Normalized curve equivalents or NCEs explain individual student scores on a normal distribution or bell-shaped curve with 50 NCEs as the median score. The size of the gap between black and white scores has remained fairly constant for the past ten years. Dr. Armor further testified the size of the gap was larger in the higher grades than in the elementary grades. (Testimony of Armor, Tr. at 450; State Exs. 142–45). Dr. Armor performed a statistical analysis of recent test scores in the KCMSD. He found that about 65% of the difference in test scores between black and white children was due to measurable socioeconomic status (SES) differences between black and white families. (Testimony of Armor, Tr. at 456; State Ex. 146).

This phenomenon is not restricted to the KCMSD. All major school districts suffer this test score achievement gap, according to Dr. Armor. The size of the gap nationally is approximately four-fifths of a standard deviation, compared to the gap in the KCMSD of one-half of a standard deviation. (Testimony of Armor, Tr. at 449). This means that the gap within the KCMSD is less severe than the national gap. The national gap measured in NCEs is approximately sixteen, compared to the gap in the KCMSD of ten. A school district operating with a gap between black and white test scores of about 10 NCEs is considered a good school system. (Testimony of Armor, Tr. at 449–50).

Dr. William Trent, an expert witness for the KCMSD, determined that KCMSD students do lag behind nationally in comparisons of test scores, but that after controlling for poverty, family background, and other factors, there is a penalty or "cost" to minority students—a "race effect"—affecting the achievement gap, which has continued without abatement since 1986. (Testimony of Trent, Tr. at 1276–77; KCMSD Exs. 24B–J). Because this Court found that there was a system wide reduction in achievement in the KCMSD, at least partially due to the past segregation, and a gap existed in 1986, Dr. Trent concluded the current gap could also be due to the past segregation. (Testimony of Trent, Tr. at 1277).

Dr. Trent performed a multiple regression analysis on test score data from the KCMSD that analyzed the effect that various factors have on minority student scores on the Iowa Test of Basic Skills (ITBS). Dr. Trent analyzed both the 1994 reading and mathematics scores for students in the fifth through the tenth grades. (Testimony of Trent, Tr. at 1300–09; KCMSD Exs. 24E–J). He concluded that some part of the variance—approximately 4% to 9%—between black and white test scores could be explained by race. (Testimony of Trent, Tr. at 1398). The District suggested that a significant figure to calculate the race effect would be to consider the proportion that the race effect plays in relation to the entire percentage of known and measurable differences. In other words, if Dr. Trent could identify 40% of the factors that effected the NCE score, an important percentage would be the race effect—the 4% to 9%—divided by the total percentage of measurable effects on the NCE score. However, this would ignore the myriad of other effects that Dr. Trent did not analyze: birth weight, whether the student is raised by a single parent, proficiency in English, parental interest and involvement. This list is by no means exhaustive. The more accurate identification is simply the percentage of the achievement gap that may be explained by race.

Teacher efficacy (low expectations) increases this "race effect." (Testimony of Trent, Tr. at 1364–69). Teacher efficacy refers to the feeling that a teacher has that he or she has the ability to make a difference. If a teacher does not expect achievement from his or her students, then it may not be produced. Using responses from questionnaires of students concerning the expectations of their teachers, Dr. Trent assigned values to particular schools, ranging from one to five—five being highest—which rated

the schools regarding teacher efficacy. Dr. Trent found a positive correlation between schools with high teacher efficacy and higher test scores, as well as the converse correlation. (Testimony of Trent, Tr. at 1340–41, 1348, 1364–69, 1374; KCMSD Ex. 24K). Using KCMSD Exhibit 24G, the following table represents a summation of the effect that race and teacher efficacy has on student mathematic scores taken in 1994:

| GRADE | % Effect of Race | % Effect of Teacher Efficacy |
|---|---|---|
| Fifth Grade | 4.2% | 2.8% |
| Sixth Grade | 7.3% | 2.8% |
| Seventh Grade | 5.6% | 1.7% |
| Eighth Grade | 6.2% | 1.3% |
| Ninth Grade | 7.8% | .7% |
| Tenth Grade | 5.3% | 0% |

The next table depicts the same data for reading scores within the KCMSD (KCMSD Ex. 24H):

| GRADE | % Effect of Race | % Effect of Teacher Efficacy |
|---|---|---|
| Fifth Grade | 4.3% | 2.5% |
| Sixth Grade | 7.9% | 4.0% |
| Seventh Grade | 4.8% | 1.8% |
| Eighth Grade | 6.4% | 2.1% |
| Ninth Grade | 9.2% | 2.2% |
| Tenth Grade | 8.4% | .7% |

The percentage shown identifies the effect that race and teacher efficacy had on the gap between black and white test scores. Dr. Trent performed a series of regression analyses on the test score data and could account for approximately 35% and 40% of the total gap, leaving at least 60% unexplained. (Testimony of Trent, Tr. at 1309).

As Dr. Armor pointed out, not only is there a gap between black and white test scores, this gap increases as KCMSD students proceed through school. (Testimony of Armor, Tr. at 450). Using KCMSD Exhibit 24B for the background data, the following table represents the *increase* in the gap between black and white students in reading and math scores for the KCMSD. The series of grades in school that the test scores were taken are indicated in parentheses:

| CLASS | Increase in Math Gap | Increase in Reading Gap |
|---|---|---|
| Class of 1992 (8–12) | 1.71 | 5.46 |
| Class of 1993 (7–12) | 2.60 | 5.86 |
| Class of 1994 (6–12) | 9.73 | 6.46 |
| Class of 1995 (6–11) | 8.37 | 7.96 |
| Class of 1996 (4–10) | 6.46 | 6.95 |
| Class of 1997 (3–9) | 4.88 | 7.36 |
| Class of 1998 (2–8) | 2.63 | 2.70 |
| Class of 1999 (1–7) | 1.96 | 8.01 |
| Class of 2000 (K–6) | 3.61 | 10.15 |
| Class of 2001 (K–5) | 3.45 | 4.74 |
| Class of 2002 (K–4) | ( .18) | 6.76 |

These figures translate into a reality within the KCMSD of black students who not only arrive at school achieving below their white classmates, but also whose separation grows as they attend the KCMSD. In other words, while the gap between black and white test scores is in place when a kindergarten student enrolls in the KCMSD, ranging from between four and eleven NCEs, by the time that student has reached the fifth or sixth grade, the gap has increased by an amount ranging from between three and a half to as many as ten NCEs. While the size of the increase varies from class to class, in only one instance does it narrow. The increase in the achievement gap appears to be less severe in the scores for mathematics compared to the reading scores. Dr. Armor also testified, however, that the increase in the achievement gap that occurs as a student moves through school is a national trend as well. (Testimony of Armor, Tr. at 450–51). According to Dr. Trent, many factors influence the increased size of the gap as students move through the higher grades. (Testimony of Trent, Tr. at 1290–91). These factors include the change of the mix of students who take the test, as well as changes in students' performance from year to year. The gap increases, however, at all grade levels tested except one: the mathematic scores from the kindergarten to fourth grade. The gap actually decreased a small amount (.18) in the comparison of these grade levels.

In another comparison of black and white gains within the KCMSD, black students

gain on average only 1.1 grade equivalents in reading skills in the four years of high school, compared to the average white gain of 3.4. (State Ex. 154). Central High School and East High School registered no increase at all in grade equivalents in reading for black students. A black student in those two high schools exits with his or her diploma and the same skill level in reading as when they entered as a freshman. Black students fare somewhat better in mathematics. An average black student in the KCMSD increases 2.1 grade equivalents for the four years of high school, while a white student increases by 3.5 grade equivalents. *Id.*

The State attempted to use other evidence to demonstrate the educational achievement of KCMSD students. Dr. Armor testified both about the differences in dropout rates between black and white students and college attendance plans. The unreliability of the statistics that Dr Armor used, however, casts a shadow upon their usefulness. Therefore, the Court will not consider that data.

### a. *Low Expectations*

Much of the plaintiffs' and KCMSD's case focused on their allegation that teachers in the KCMSD have "low expectations" for black students. Plaintiffs argued that state-mandated segregation led to the view that blacks were inferior learners and less capable students. As the black population increased in the District and black students enrolled in schools that had been previously nearly all white, many whites moved out. *Jenkins*, 593 F.Supp. at 1494. As white students abandoned the formerly all-white schools, the KCMSD further weakened the course offerings in the schools they left, compounding the distinction between black and white schools and adding substance to the general view that schools with black students were inferior to schools with primarily white students. Stipulation, February 21, 1984 at n. 75. This created a spiraling effect that diluted learning and resulted in a characterization of the KCMSD as offering lowered educational opportunities.

The plaintiffs and the KCMSD offered witnesses who claimed these vestiges of "low expectations" lead to poor performance by black students on standardized achievement tests. Using a 1995 KCMSD survey of students, Dr. William Trent assigned an efficacy rating to each school, which resulted in a rating between 3.30 and 4.20, with the median value being 3.66. (Testimony of Trent, Tr. at 1345, 1350). Dr. Trent defined efficacy as a teacher's feeling that he or she could make a difference in a child's achievement. (Testimony of Trent, Tr. at 1279). He then concluded that higher efficacy seemed to be correlated with higher achievement and low efficacy seemed to be correlated with lower achievement. (Testimony of Trent, Tr. at 1279–80, 1352). According to Dr. Trent, lower expectations of minority students at least partially cause the increase in the achievement gap as a student moves through the higher grades. (Testimony of Trent, Tr. at 1291). Dr. Trent submitted data that the Court used to create charts that show the "efficacy effect" on KCMSD students' test scores, *supra*, under the discussion of the achievement gap.

Much of the rest of the evidence concerning low expectations and low teacher efficacy was anecdotal. Several KCMSD witnesses testified that teachers evidenced "low expectations" by allowing students in the classroom to remain "off-task." (Testimony of J. Williams, Tr. at 1225; Testimony of Love, Tr. at 1479–81). Off-task activities included sleeping, sitting idle, and inattentiveness to classroom lessons. (Testimony of Love, Tr. at 1479–80). Low expectations also manifest themselves in the assignments students are given. Rather than foster creative interaction with the students, many teachers assign worksheets for the students to complete in the classroom. (Testimony of Love, Tr. at 1479). Several students testified they were not aware of "low expectations" from their teachers, although many spoke of non-challenging class work and little homework. Almost all of the students complained of being given only worksheets to fill out in class. One school lacked the supply of books necessary to allow the students to take their books home. (Testimony of Banks, Tr. at 2812; Testimony of Holt, Tr. at 2822, 2829; Testi-

mony of Oulds, Tr. at 2828–29; Testimony of Cunningham, Tr. at 2831–32, 2838).

Dr. Eric Cooper, a KCMSD expert, testified that he visited two KCMSD schools in connection with his expert analysis in this case. (Testimony of Cooper, Tr. at 1868–71 ). He saw no evidence of low expectations at either school. Instead, he observed students "engaged in collaborative experiences" at one school and "committed teachers and a committed principal" at the other school he visited. (Testimony of Cooper, Tr. at 1868, 1871). To the extent some teachers in the KCMSD may have low expectations for their students, such expectations typically arise out of teachers' sincere frustrations at their inability to help students learn and not because of discrimination or racism. (Testimony of Cooper, Tr. at 1872). Dr. Cooper testified that the problem of low expectations is a national problem that exists in all urban school districts and to the extent low expectations exist in the KCMSD, Dr. Cooper admitted the problem is no worse than it is elsewhere. (Testimony of Cooper, Tr. at 1871–72).

#### b. *Intergenerational Effect*

While all students can learn to high degrees of success, they do not all begin at the same starting line. (Testimony of Bartman, Tr. at 3113). Family income and educational attainment have important educational effects on children. (Testimony of Armor, Tr. at 280; Testimony of Hanushek, Tr. at 831–32). These factors affect what is in the "tool box" students bring to school. (Testimony of Rainwater, Tr. at 2412, 2414). They influence the readiness of children to learn, the breadth of their experiences, and their preschool ability to read (Testimony of Rainwater, Tr. at 2414).

Dr. David Armor testified that a student's socioeconomic background (SES) determined the size of the achievement gap between test scores of black and white students. (Testimony of Armor, Tr. at 506). Plaintiffs, however, argued that the parents' low SES was itself caused by both the effect of the dual housing market within the KCMSD and the parents attendance at *de jure* segregated

schools in the KCMSD. (*See* Testimony of Hanushek, Tr. at 828–30). Continuing down that path of logic, any low achievement of their children, therefore, caused by low SES was itself a direct result of prior *de jure* segregation in the KCMSD.

Plaintiffs attempted to link the prior state-sanctioned discriminatory practices within the housing market to the low wealth and income of blacks residing within the KCMSD. Racial discrimination affects wealth distribution in that a significant portion of family wealth consists of equity in the home. (Testimony of Hanushek, Tr. at 829). As a result of the State's housing market discrimination, large numbers of blacks were denied the opportunity to own a home. As a result of the dual housing market in the KCMSD, not only were blacks less likely to be homeowners, but those blacks who were homeowners achieved much less appreciation in their homes during subsequent periods of inflation, in the 1970s and early 1980s. (Testimony of Hanushek, Tr. at 830).

Additionally, plaintiffs presented evidence to connect KCMSD parents' attendance at segregated schools to the low achievement of their children. Dr. Robert Crain conducted an extensive survey in which he collected data concerning the parents of KCMSD students and characteristics of their households. (Testimony of Crain, Tr. at 2090–91). The survey included information on the parents' income, education, whether they attended segregated or integrated schools, and details about their home life. One analysis of a larger sample included parents who had attended segregated schools, but not necessarily within the Kansas City Missouri School District. A smaller sample contained parents who had attended segregated schools only within the KCMSD. (Testimony of Crain, Tr. at 2194–95). Dr. Crain matched the survey results of parents' background and home life with the child's achievement test scores. (Testimony of Crain, Tr. at 2117). In the analysis performed on the larger sample survey results, which included parents who had attended any segregated school, Dr. Crain found the following statistically significant: it was less likely that the

parents would read, that the child would read, or that there would be a computer with a modem in the home than those parents who had attended integrated schools. (Testimony of Crain, Tr. at 2125; Plaintiffs Ex. 40–S). In the analysis conducted on the smaller sample—those parents who had attended only KCMSD segregated schools—statistics revealed a significant relationship between a KCMSD parent who had attended a KCMSD segregated school and their child performing poorly on specific mathematics standardized tests. (Testimony of Crain, Tr. at 2194–96; Plaintiffs Ex. 40–R). This result was obtained, however, when using KCMSD records of the racial composition of schools, not the individual parent's recollection of the racial make-up of the school they attended. (Testimony of Crain, Tr. at 2117).

### c. *Curriculum and Other Deficiencies*

Both the plaintiffs and the KCMSD presented a multitude of evidence concerning problems which exist within the KCMSD. Many KCMSD teachers, principals, and central administrators admitted that the District has had no district-wide core curriculum specifying what all students should know and be able to do. (*See, e.g.,* Testimony of Norby, Tr. at 1127, 1129, 1200; Testimony of Mahone, Tr. at 1739–40; Testimony of Ramsey, Tr at 3180–81; Testimony of Love, Tr. at 1520; Testimony of Rainwater, Tr. at 2443; Testimony of J. Williams, Tr. at 1228–29). Only recently has the KCMSD implemented its newly developed core curriculum in a few schools, with full implementation to be in place in three to five years. (Testimony of Norby, Tr. at 1149). Similarly, learning in the KCMSD suffers because of the uneven quality · of instruction. KCMSD teachers range from very good to very poor and there are far too many mediocre and poor teachers. (Testimony of Love, Tr. at 1554; Testimony of Ramsey, Tr. at 3187). General professional development efforts in the KCMSD have been without a district focus, often without even a building-level focus. (Testimony of Cooper, Tr. at 1784–86, 1801–09; Testimony of Norby, Tr. at 1115, 1117; Testimony of Mahone, Tr. at 1728). Teachers need to incorporate a wide variety

of assessment tools in their classroom practice that will help them determine the level of individual learning so that they can understand each student's strengths and needs. (Testimony of Rainwater, Tr. at 2424). These assessment tools provide each student with the learning experiences needed in order to master the curriculum and become a participating citizen with a family-sustaining job. (Testimony of Rainwater, Tr. at 2423; Testimony of Cooper, Tr. at 1784).

### d. *Analysis of Unitary Status: The Achievement Gap*

■ At the outset, the Court notes the awkward posture that the KCMSD has assumed. Basically the KCMSD has placed itself in the role of arguing that it is an ineffective school district, compared to the ordinary school district that touts its accomplishments at a unitary status hearing. This is viewed by the Court as an obvious attempt to keep in place the court-ordered tax levy. There is absolutely no basis under the law that the Court can sustain imposition of that levy simply because the alternative would result in "fiscal chaos." *See Jenkins III,* 515 U.S. at ——, ——, 115 S.Ct. at 2054, 2056 (mandating that a district court's responsibility is to return schools to local control as soon as practicable so that true accountability within our governmental system may be restored); *Freeman,* 503 U.S. at 489, 112 S.Ct. at 1449 (same); *Arthur v. Nyquist,* 904 F.Supp. 112, 118 (W.D.N.Y.1995) (denying plaintiff's request for the court to retain control of the school system solely for the purpose of ensuring continued funding).

■ The Court's task, following the mandate in *Jenkins III,* is to restore state and local control as soon as possible, and if the KCMSD has not achieved unitary status, identify the incremental effect that the prior discrimination had on the achievement gap. *Jenkins III,* 515 U.S. at ———-——, 115 S.Ct. at 2055–56. Further, *Jenkins III* requires that the Court give the District a precise statement of its obligations in the remedial effort to cure the effects of the prior discrimination. *Id.* at ——, 115 S.Ct. at 2055.

■ There is no dispute between the parties that an achievement gap exists between black and white test scores. The question the Court must focus on is the cause of the gap. The State maintains the gap is explained by socioeconomic factors: 65% by factors whose effects can be measured, with the remaining portion attributable to unmeasured or unmeasurable socioeconomic factors. First, KCMSD and the plaintiffs argue that while socioeconomic status plays a role in the achievement gap, so too does race. KCMSD's expert identified a 4% to 9% "race effect" factor in his analysis of the achievement gap. Further, plaintiffs advance the notion that because race influenced the determination of socioeconomic status by affecting the parents who attended segregated schools—the so-called intergenerational theory—therefore by extension that prior discrimination affects the achievement gap of their children. Another argument advanced by both the plaintiffs and the KCMSD centers around the perceptions of KCMSD teachers. The plaintiffs and KCMSD contend that some teachers in the KCMSD have lowered expectations for minority students, thus lowering those students' achievements. Finally, plaintiffs and the KCMSD point to a plethora of factors that make "quality education" presently unattainable in the KCMSD schools. The Court will discuss each of the above factors on achievement and the achievement gap in reverse order.

First, plaintiffs and the KCMSD set forth deficiencies within the KCMSD. These include a lack of a core curriculum, uneven quality of teachers, a sustained district-wide focus on professional development, and a failure to implement a variety of assessment tools. The Court believes that each of these are important to the growth of achievement overall, but does not necessarily involve the reduction of the achievement gap between black and white test scores. These deficiencies relate only peripherally to an achievement gap. Instead, these factors constitute the building blocks of a good school system, which admittedly, the KCMSD is not. Improvements in those areas will influence the achievement of all students, and in the process will affect the gap between black and white students. The Court does not believe these deficiencies can be tied to the prior discrimination that occurred thirty years ago. In a later section, however, the Court will discuss the need for a focus on education and achievement and a move away from the top-heavy administration in the KCMSD.

Second, addressing plaintiffs' intergenerational theory: nationwide, in 1995, over 29% of blacks lived below the poverty line, compared to only 11% of whites. JULIE A. NICE & LOUISE G. TRUBEK, CASES AND MATERIALS ON POVERTY LAW 9 (1997). This means that if you are born black, you stand more than two and a half times greater chance than a white person to live in poverty. It is a dismal legacy that in this country, you are much more likely to be poor if you are a member of a minority. Further, once in poverty, escape is mired by too few jobs and in many cases, a substandard education. Perhaps no decision delivered by the Supreme Court has had such a far-reaching societal effect as its pronouncement that in America, children are not entitled to an equally-funded education but simply a public one. *See San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Children of poor parents live in poor neighborhoods and attend poor schools, staffed by teachers who make less, make do with less, and, some of the time, teach less. Dropout rates escalate, as do crime rates. The cycle of poverty continues if not momentarily broken by the drug culture, or alternatively, prison time However, these societal woes fall outside the jurisdiction of this Court. As shamed as we all should be of the condition of some of our nation's cities and schools, this Court may attempt to remedy only a constitutional wrong, as interpreted by the Supreme Court.

Next, the Court turns to the plaintiffs' and KCMSD's theory of the allegedly "low expectations" (or "low teacher efficacy") of the KCMSD teachers regarding black students. Some of the most appalling testimony this Court heard during the three-week hearing on these motions was the admission of some members of the KCMSD administration that

they had witnessed students who simply filled out a worksheet during class time, as well as students sleeping in class. It is beyond belief to this Court that these administrators took no action upon witnessing these classroom behaviors. The State suggests in their post-hearing briefs that this low expectation theory came late in the day to the plaintiffs and the KCMSD and the witnesses contradicted their prior deposition testimony at the hearing. Whether true or not, let the Court say distinctly that low expectations have no place in a school system. Every child can learn, and it is the mission of educators to achieve that goal. An impoverished student, whether white or black, deserves more concentration and focus, not less. How can this society ever hope to remedy the societal ills of abject poverty without the help of educators? That it may be difficult is not the issue. Of course it will be difficult. But elusive goals are not necessarily unattainable goals.

Concerning the effect of low expectations on the achievement gap, low expectations of teachers, which manifests itself in lowered academic standards, academic challenges stripped from already disadvantaged students, contacts with teachers minimalized, and bare rote memorization as well as only tedious completion of worksheets, deny students—all students—a quality education. To qualify for a remedy from this Court, however, it must be connected to the prior *de jure* discrimination. *Jenkins III*, 515 U.S. at ——, 115 S.Ct. at 2056.

Only Dr. Trent's analysis statistically supports the conclusion that teacher efficacy increases the "race effect" on the achievement gap. In the chart that the Court prepared, the increase in the achievement gap between black and white students caused by low teacher efficacy ranges between 2% and 4%. When Dr. Trent initially isolated the race effect on the achievement gap, he found that race decreased the students' NCE scores by between 8.8 and 13.1 points. The other factors Dr. Trent identified all reduced the effect of race on the achievement gap. In other words, for each additional variable introduced in the analysis, the gap became

smaller. However, when Dr. Trent ran the analysis using his efficacy rating, that variable caused an increase in the gap. The Court finds that the increase in the achievement gap of 2% to 4% due to teacher efficacy can be shown to be related to the prior discrimination.

Finally, concerning the existence of an achievement gap, the Court notes that these gaps exist across the country: in prior segregated school districts and districts that have not discriminated against minority students. As many witnesses testified, poor students come to school with fewer skills. As well as suffering an initial disadvantage, the environment at home to which these students are subjected also negatively impacts their educational experience. That is exactly why the school district has to put forth more effort, not less. Dr Trent's regression analysis, however, demonstrated that race does negatively affect the test scores of minority students. A minority student reduces his NCE score by a range of some 4% to 9% simply by being born a particular race, unrelated to SES.

As the Court discussed earlier, regarding its motion for unitary status, the State bears the burden of showing this effect is not causally related to the prior discrimination. Only in school districts that have already been declared unitary does the burden shift to the plaintiffs. The Court finds that Dr. Trent's test is reliable and accurately identifies the incremental portion attributable to the prior *de jure* discrimination. Race, by itself, reduces a black student's test score by 4% to 9%. Low expectations increase the achievement gap by 2% to 4%. Combining these incremental portions, using the high end of the range for both factors—race and teacher efficacy—the total "race effect" amounts to 13% of the achievement gap.

Further, the *increase* in the gap needs consideration. While minority school children arrive at school without the necessary skills for high achievement, the gap between blacks and whites increases while they are students within the KCMSD. As the Court discussed earlier, this gap grows from as little as three and a half to as large as ten

NCEs. The Court cannot say for certain that the same factors that play a role in the original gap do not influence the increase in the gap as well. It seems reasonable to this Court that the "race effect" plays just as substantial a role in the increase that it did in creating the original gap.

Therefore, to sum up, the original gap between black and white test scores is approximately ten NCEs. The increase in the achievement gap at the high end is approximately ten NCEs. The Court has found that 13% of the initial gap and 13% of the increase in the gap may be traced to the prior discrimination within the KCMSD. This translates into a mandate to the KCMSD to reduce the achievement gap by 2.6 NCEs. Further, as discussed later in this opinion, this task is to be completed within three years. The Court finds that the KCMSD has not currently attained unitary status regarding the achievement gap.

## 2. The *Green* Factors

### a. *Student Assignments (Racial Isolation Vestige)*

■ Dr. Christine Rossell reviewed the success of the KCMSD in reducing the number of either predominantly minority or white schools. The number of schools with enrollments greater than 90% minority have been reduced from 25 in 1986 to 16 in 1996. (State Exs. 10b, 50). Minority enrollment at four high schools, two middle schools, and ten elementary schools exceeds 90%. Dr. Rossell testified that this number is not likely to decrease further because of the approximately 80% minority enrollment of the KCMSD. (Testimony of Rossell, Tr. at 88; State Ex. 8). Dr. Michael Stolee, an expert for the KCMSD, confirmed that, given the constraints of the District's demographics, further efforts at achieving a better racial balance would be impractical. (Testimony of Stolee, Tr. at 1993). Within the boundaries of the KCMSD, the District contains a central area with a high percentage of minority residents. As this central core of heavy minority population expanded, so too did the number of minority schools. (Testimony of

Clark, Tr. at 1010–13: State Exs. 116–18). Using 1990 census data, one witness reported that the proportion of the city which is less than five percent minority has decreased to about a third, compared to the approximately two-thirds it comprised in 1970. (Testimony of Clark, Tr. at 1010). This expansion of a central core of heavy minority residential area makes it difficult to alter the racial composition at the traditional elementary schools which lie within that area. (Testimony of Clark, Tr. at 1021).

White enrollment for the District has steadily declined since 1967, although at a much lower rate in recent years, while minority enrollment has remained fairly constant since 1979, and increased in recent years. (State Exs. 3a, 4, 5). The number of schools whose enrollments contained greater than 50% white students dropped from 17 schools in 1986 to only two in 1992. Beginning in 1993, the enrollment of every school in the KCMSD has been at least 50% minority. (State Ex. 9).

With regard to the level of desegregation achieved, Dr. Rossell relied on two indices commonly used by social scientists. The Court notes, however, that these compare only averages, not the success or failure of desegregation at individual schools. An aggregate often presents a different picture from its parts. The interracial exposure index measures the average percent white enrollment in the typical minority child's school. Its maximum value is the percent white in the entire school system—about 20 in the KCMSD. (Testimony of Rossell, Tr. at 91–92). Dr. Rossell testified that the value of the index was almost at its maximum value for all schools, as well as for each grade level. (State Exs 3a, 6) The other evaluation used by Dr Rossell to determine the level of desegregation is called the racial imbalance index. The lower the index value—a number from zero to one hundred—the more racial balance achieved by that district. (Testimony of Rossell, Tr. at 94–95). Dr. Rossell testified that the index for all schools in the KCMSD was approximately 30, which, when compared to other school districts under court order, was relatively low, indicating a

high degree of racial balance had been realized. (Testimony of Rossell, Tr. at 97–98; State Ex. 14). Dr. Rossell believed it would be counterproductive to mandatorily reassign children to achieve any greater balance because that would result in the loss of white enrollment as white students reacted negatively to the mandatory assignments. (Testimony of Rossell, Tr. at 107). This, in turn, would result in less interracial exposure and less desegregation. (State Exs. 55a, 55b).

The KCMSD maintains the current racial balance is unknown. The elimination of racial isolation within the KCMSD has been achieved by an aggressive system of magnet schools, which in part relied on the voluntary transfer of suburban students. (Testimony of Stolee, Tr. at 1993). The Supreme Court disapproved that portion of the remedial plan which sought to attract suburban white students in order to eliminate racially identifiable schools within the KCMSD. *Jenkins III,* 515 U.S. at ——, 115 S.Ct. at 2051. Schools lost significant enrollment of white suburban students in the 1995–96 school year after the District ceased providing transportation for those students because of the Supreme Court decision. Thus, the KCMSD contends the District is in a stage of transition and unable to assess its racial composition until the full ramifications of the withdrawal of the suburban students is known. East High School lost approximately 20 white suburban transfer students following the Supreme Court's ruling in *Jenkins III.* (Testimony of Maricle, Tr. at 3042). Further, after decreasing steadily over the last few years, the racial imbalance index used by Dr. Rossell shows an increase in 1996 across both elementary and secondary schools. (State Exs 10a, 34a, 42a). Dr. Rossell opined that significant changes in white enrollment from resident white . students within the KCMSD are not likely to occur now if they have not occurred before. (Testimony of Rossell, Tr at 278).

The uncertain status of the available revenues for the District further complicates the analysis of the racial isolation vestige. The KCMSD will not be able to support and maintain the present magnet system because

it is too costly, considering fiscal realities. (Testimony of Stolee, Tr. at 1995). According to Dr. Stolee, the KCMSD must develop and implement a student assignment system that focuses exclusively upon pupils residing in the District, achieves a substantial measure of racial balance in as many schools as possible, and can be accomplished at a cost which can be sustained through the District's anticipated revenues, even if those revenues are based only on the state-minimum tax levy of $2.75. (Testimony of Stolee, Tr. at 1993–94). Dr. Stolee concluded that within a two- to three-year period, the KCMSD can be reorganized in a way that will save many millions of dollars in staffing costs, transportation costs, and program expenses without sacrificing all of the gains which the KCMSD has made in eliminating racial isolation. (Testimony of Stolee, Tr. at 2009–10).

### b. *Faculty and Staff Assignments*

Dr. David Armor, an expert testifying for the State, conducted an analysis of faculty assignments for school years 1992–93 through 1995–96 to determine if a pattern of racial discrimination existed in the assignment of faculty within the KCMSD. Using a plus or minus range of 15%, Dr. Armor concluded the KCMSD had maintained a substantial degree of racial balance in faculty assignments. In other words, he sought to determine that the number of minority faculty assigned to particular schools did not vary more that 15% from the number of minority students within the District as a whole. During the four years he investigated, 90% to 95% of all secondary schools fell within the plus or minus 15% guideline and 72% to 85% of the elementary schools met the guideline. (State Ex. 132). However, the elementary schools showed a steady decline from a high of 85% of schools in 1992–93 falling within the guideline, to only 72% in 1996.

### c. *The Remaining* Green *Factors*

No one can doubt the excellence of the current KCMSD school facilities. While some renovation work remains incomplete at a few schools, the KCMSD still enjoys almost unequaled physical resources. The plaintiffs charge, however, that while the buildings

have been completed, many of the magnet programs have not been fully and effectively implemented. At least fifteen magnet schools within the KCMSD were not fully implemented in full compliance with the orders of this Court. To arrive at this figure, plaintiffs have compared the magnet schools to the Long Range Magnet Plan (LRMP). Sharon LePage, the DESE Director of Desegregation Services, testified however, that all magnet themes have been in place since at least 1991 with the exception of Elementary II, a new Montessori school, only ordered in 1993. (Testimony of LePage, Tr. at 306–08; State Exs. 51, 68A–C). Dr. Christine Rossell testified that during her career, she had inspected hundreds of magnet schools. After her inspection of some ·of the KCMSD magnets, she testified that the facilities and resources devoted to the KCMSD magnet programs surpassed by far any other program she had ever seen. (Testimony of Rossell, Tr. at 139).

To determine any possible inequitable distribution of funding and teacher resources, Dr. David Armor analyzed data for two recent school years, 1994–95 and 1995–96. Because the traditional elementary schools are predominantly minority, while the magnet elementary schools tend to have a more integrated enrollment, Dr. Armor compared the distribution of teacher resources at the two types of schools. For both school years, he found no significant differences in teacher assignments disfavoring the predominantly minority traditional schools with respect to the years of teaching experience, the degree of teacher education, or the student-pupil ratio. Concerning the equality of funding, Dr. Armor determined approximately $500 to $600 more per pupil was spent at the magnet elementary schools, but this amount was within the normal range of extra funding required for magnet schools. (State Exs. 137–39).

Because all secondary schools are magnet schools, Dr Armor compared the allocation of' resources at schools with an enrollment of over 90% minority students with those at the schools with less than a 90% minority enrollment. He found no significant differences

that disfavored the over 90% minority schools. In 1994–95, the over 90% minority schools had more experienced teachers, more teachers with master's degrees, and lower pupil-teacher ratios. (State Ex. 134). With regard to funding, the schools with enrollments greater than 90% minority spent slightly more on instructional salaries, instructional supplies, and total operational funding, although the differences were not significant. (State Exs 137–39).

Both former and current KCMSD officials testified there was no discrimination in the provision of transportation and extracurricular activities in the KCMSD. (Testimony of Newsome, Tr. at 2575; Testimony of Rainwater, Tr. at 2459; Testimony of J. Williams, Tr. at 1213–14; Testimony of Love, Tr. at 1538).

### d. Analysis of Unitary Status: The Green Factors

The remedy of desegregation in the KCMSD relied heavily on voluntarily attracting white students from the surrounding area. Beginning in 1990, the non-resident enrollment of white students had climbed constantly until the outcome of the litigation over the increase in salaries and the "quality education" components of the remedy—Jenkins III—prompted a decrease in 1995 enrollment. The Supreme Court decreed that it was not within this Court's equitable power to order programs designed to promote "desegregated attractiveness" that would voluntarily attract non-resident white students. Before Jenkins III, the enrollment for non-resident white students reached a high of 1476 students. (State Ex. 3a). In 1995, this figure decreased by 636 students and in 1996, enrollment of non-resident white students dropped by 840 additional students.

The full ramifications of the withdrawal of 1476 white students cannot be judged at this time. The Court, therefore, finds that the KCMSD has not yet achieved unitary status with regard to the racial isolation vestige. However, the Court believes that it will take only a three-year period to assess the effect of Jenkins III on the minority enrollment within the KCMSD.

Regarding faculty and staff assignments, the Court notes the testimony of the State's witness, Dr. David Armor, who analyzed the KCMSD data. He testified that in recent years the number of elementary schools falling within the plus or minus range of 15% has decreased steadily. No matter which party carries the burden of proof, the steady decline at the elementary school level of a balanced faculty warrants further investigation. Additionally, applying the test from *Freeman,* retention of judicial control is necessary to allow the Court flexibility to achieve compliance in other areas, such as reducing expenditures. The Court finds that the KCMSD has not yet achieved unitary status as to faculty assignments. However, the Court also believes that the KCMSD should be able to remedy this defect in a period of three years. The Court orders the KCMSD to attempt to achieve by all practicable measures, a plus or minus range of 15% in faculty assignments at 80% of the elementary schools in the District.

Finally, regarding the other *Green* factors, the Court believes that no remedy plan can be set in concrete. In a desegregation effort, especially a voluntary one such as that of the KCMSD, the plan must offer some flexibility. Some programs may simply not work. It would not be in the best interests of the KCMSD for this Court to declare that unitary status may not be achieved unless every minute detail of the magnet schools as originally conceived is in place. Some magnet themes may not achieve the gains originally forecast. Budget constraints may force consolidation. Improvements in themes could always be identified, so that unitary status could never be attained. The standard required by the Supreme Court only asks that everything practicable be achieved. No one can ignore the improvement in the facilities of the KCMSD. This work is almost complete.

The Court will withhold the declaration of unitary status as to the facilities until the final renovations are completed. The Court, however, believes that this may be achieved in a relatively short time, certainly less than the three year mark that the Court has set

for the other factors. Therefore, the Court orders the KCMSD to finish the facilities upgrade within a period of two years. Further, the Court realizes that during this transition phase, while the KCMSD learns to stop relying on others for funding, some modifications will have to be made. Dr. Stolee testified that he advised combining certain magnet programs and discontinuing others. (Testimony of Stolee, Tr. at 2004–13). The Court realizes this is a necessity and orders the KCMSD to assess what combination of magnet themes should be utilized in the future to produce the best results within the fiscal realities. The Court orders the KCMSD to prepare a transition plan for submission to the Court by August 15, 1997.

Finally, the Court will address the issues of transportation and extracurricular activities: plaintiffs argue that transportation is crucial to the ability to redistribute students throughout the District. Neither the plaintiffs nor the KCMSD object to any remaining distributional inequalities in the area of extracurricular activities.

The Court agrees with the plaintiffs that the area of transportation may not be declared unitary at this time because the vestige of racial isolation remains. Transportation plays an essential role in achieving racial balance. Until that vestige has been eliminated to the extent practicable, the Court cannot relinquish its jurisdiction of transportation. Further, transportation in the KCMSD is one of the most costly elements in the budget. The Court may have to oversee transportation costs in the future. Regarding the State's motion for unitary status concerning extracurricular activities, however, the Court believes the State has carried its burden of proof. The adverse parties seem to agree no vestiges remain in the resources spent on these activities. The Court will deny unitary status as to transportation, but will grant unitary status as to extracurricular activities.

### 3. The "Financial Vestige"

The basis for this new theory of a remaining vestige from the prior discriminatory

conduct has its roots in the KCMSD's need for money. As discussed earlier, the KCMSD operates under a court-ordered tax levy of $4.96. Taxpayers of Kansas City last voted a tax levy increase in 1969. (KCMSD Ex. 27). The KCMSD first became a majority black district in 1969—the precise moment when voters stopped approving tax levies and bond issues. Those tax and bond issues had received a higher percentage of votes in support of the measure in black voting wards. *See Jenkins v. Missouri,* 855 F.2d 1295, 1305 n. 7 (8th Cir.1988). The KCMSD charges that the actions of the State precipitated an atmosphere "which prevented the KCMSD from raising the necessary funds to maintain its schools." (KCMSD's Post–Hearing Brief at 40). According to the KCMSD, by helping to perpetuate the dual system, the State contributed to the public's perception that the KCMSD was an ineffective school district.

The Court notes again it is not the duty of this Court to ensure funding for the KCMSD. That responsibility falls on the residents of the KCMSD or the state of Missouri. The KCMSD argues this Court stopped just short of finding this "financial vestige" in the Order setting forth the funding responsibilities for the capital improvement program. *See Jenkins v. Missouri,* November 12, 1986 Order at 4. The KCMSD further maintains the Eighth Circuit affirmed this vestige in its opinion reviewing that Order. *See Jenkins,* 855 F.2d at 1305. However, the comments the Eighth Circuit made in that opinion referred to the justification for requiring the State to fund 75% of the remedy ordered by this Court. Further, the KCMSD quoted language actually advanced by plaintiffs in a brief submitted to the Eighth Circuit. The Eighth Circuit did not issue that language as its own. The Court rejects this theory as constituting any part of the remaining vestige of the prior discrimination.

### IV. The Agreement

■ The Agreement provides for payment of $314 million from the State to the KCMSD over a three-year period. Some of the funds due under the Agreement have already been paid for Fiscal Year 1997. The Agreement provides further details regarding the payment of the remainder of the funds, and the State acknowledges that the actual payments will amount to an approximate total of $320 million because of increased funding ordered by the Court in its July 15, 1996 Order.

The State maintains it has fulfilled its remedial obligations due to its prior unconstitutional conduct and that the Agreement provides ample transition funds while the KCMSD becomes self-sufficient. The State further argues it has provided sufficient funds over the last eleven years to the KCMSD with which the KCMSD should have been able to implement programs to eliminate the vestiges of the prior discrimination.

The AFT recognizes the Agreement will provide for transition funding while the KCMSD searches for replacement revenue. While noting that endorsing the Agreement was a difficult decision, the AFT believes that the benefits outweigh the risks associated with approval of the Agreement.

The KCMSD posits that elimination of the constant litigation will enable the KCMSD to concentrate on removing the final vestiges of the prior segregation. Additionally, the KCMSD asserts that the Agreement will ensure more funding than the KCMSD could reasonably expect to gain from further litigation. "The Agreement offers the District more funding than could be obtained through continued litigation...." (KCMSD'S Post–Hearing Brief at 2). Approval of the Agreement will foster increased cooperation from the State rather than the continual litigious nature of the relationship in the past. In considering programs to advance the goals of the KCMSD, the State can focus on the benefits of the program without considering that they will be responsible for the funding.

The plaintiffs present several arguments against the proposed Agreement: (1) the State should not be allowed to "purchase its way out of its obligations as the primary constitutional violator" (Post–Trial Memorandum of Plaintiffs in Opposition to the Motions for Unitary Status and for Approval of

the May 21, 1996 Agreement at 3); (2) approval of the Agreement would be procedurally improper because the plaintiffs cannot be bound to a contract to which they were not a party; (3) the Agreement is beyond the authority of the Court to approve because it cannot affect the matter in issue and is not a justiciable controversy (*id.* at 10–13); and (4) even when viewed as alternative remedy plan, approval of the Agreement would be procedurally improper because the State has never properly pled an action for declaratory relief pursuant to Rule 8 of the Federal Rules of Civil Procedure. (*Id.* at 14–15).

In *Jenkins III,* the Supreme Court provided guidance on the issue of releasing the State from further desegregation obligations. First, it directed this Court to "consider that the State's role with respect to the quality education programs has been limited to the funding, not the implementation, of those programs." *Jenkins III,* 515 U.S. at ——, 115 S.Ct. at 2055. Further, *Jenkins III* appraised the remedy ordered by this Court for the KCMSD:

> The District Court also should consider that many goals of its quality education plan already have been attained: the KCMSD now is equipped with "facilities and opportunities not available anywhere else in the country." KCMSD schools received an AAA rating eight years ago, and the present remedial programs have been in place for seven years. It may be that in education, just as it may be in economics, a "rising tide lifts all boats," but the remedial quality education program should be tailored to remedy the injuries suffered by the victims of prior de jure segregation. Minority students in kindergarten through grade 7 in the KCMSD always have attended AAA-rated schools; minority students in the KCMSD that previously attended schools rated below AAA have since received remedial education programs for a period of up to seven years.

*Id.* at ——, 115 S.Ct. at 2056 (internal quotations omitted).

The State presented evidence concerning the level of desegregation funding in Kansas City compared to other school districts, as well as the level of State spending compared to other states. Dr. Eric Hanushek, a professor of economics at the University of Rochester, testified that after adjusting for regional cost of living differences, the KCMSD spends more per pupil than any of the largest 280 school districts in the United States. (Testimony of Hanushek, Tr. at 768; State Ex. 164). While the KCMSD reported spending $8316 per pupil in the fall of 1993, when adjusted for cost of living—which standardizes the amount spent in districts across the country by what purchasing power those dollars actually have—that amount increased to $8990. When unadjusted for the cost of living, the KCMSD still ranked ninth out of the 280 largest districts with a per-pupil expenditure of $8,316 compared to the average of $5,095.

If Kansas City receives the $320 million from the Agreement and equalizes spending over a five-year period, the KCMSD would still rank as one of the top ten spending school districts in the nation. (State Ex. 174). Even if the KCMSD lost all State desegregation funding, the KCMSD would remain in the top 25% of the largest school districts with regard to the amount it would be able to spend on each pupil.

The KCMSD presented evidence that the transition funding provided under the Agreement would be sufficient to allow a systematic and orderly transition period during which the KCMSD could become self-sufficient and independent from State desegregation funding. Dr. John Murphy, a former superintendent of schools in both Prince George's County and Charlotte–Mecklenburg, testified that if the Agreement was approved, the KCMSD would have approximately $6,000 per pupil to spend per year. (Testimony of Murphy, Tr. at 1941). This amount would provide the KCMSD sufficient funds not only to offer a quality education, but also to make the curriculum and other reforms necessary to improve student achievement. (Testimony of Murphy, Tr. at 1903, 1940—42). Strategies for success in the KCMSD, however, must be designated for priority needs. *Id.* Dr. Murphy accomplished similar goals in

Prince George's County while spending only $5405 per pupil in 1993–94, compared to the KCMSD's per pupil expenditure of $8,316. (State Ex. 184).

The KCMSD provided further evidence of its ability to reduce its expenditures by presenting a transition plan which would close several high schools. The KCMSD currently operates magnet programs in each of the ten regular high schools. These ten high schools have seats for 15,969 pupils, but enroll only 7,680 pupils. (Testimony of Stolee, Tr. at 1996). Some schools that are now operating below 50% capacity could absorb other magnet programs. The "capacity" of a school equals the actual number of seats available multiplied by 85%. In other words, the "capacity" of a school amounts to only 85% of the true number of seats available for students. Several of the KCMSD magnet high schools are under-utilized. Paseo High School presently enrolls 751 pupils in a building with an 85% capacity of 1556. This amounts to a utilization rate of 48% of the 85% capacity figure. Lincoln Prep High School utilizes only 35% of its 85% capacity capability figure of 1479 by enrolling only 574 pupils. Metro High School enrolls only 835 pupils in a building which has an 85% capacity of 2040. This amounts to a 41% utilization rate. (Testimony of Stolee, Tr. at 1998; KCMSD Ex. 10).

Transportation costs for high schools are costly since pupils are transported from all parts of the KCMSD to high schools in all parts of the KCMSD. Any plan to close high schools must also provide for a decrease in transportation cost. (Testimony of Stolee, Tr. at 1995–99). One possible scenario would require that three or four centrally located high schools would house all of the high school magnet programs. This would result in a decrease in transportation costs. *Id.*

Dr. Michael Stolee, Professor Emeritus at the University of Wisconsin–Milwaukee, testified further savings could be realized by creating attendance zones, especially for the traditional elementary schools. Currently, the KCMSD transports minority students who reside near the south boundary line of the primarily minority central core of the KCMSD to attend school in the north and conversely, bus students who live in the north to attend school in the south. (Testimony of Stolee, Tr. at 2002–03; State Exs. 122, 125). Certain elementary schools in the KCMSD are located in racially diverse residential areas, but children are transported to distant schools (Testimony of Stolee, Tr. at 1002–04). The transition plan provides that these schools should serve the area in which they are located. Dr Stolee also recommended consolidating magnet programs and therefore achieving further transportation savings.

Additionally, Bonnie McKelvey, KCMSD's Director of Budgeting, testified that the KCMSD occupies a better position than many school districts with respect to capital improvements. Typically, an average school district funds capital improvements through special bond issues, which are amortized over at least twenty years. (Testimony of McKelvey, Tr. at 1619–20). However, a major portion of KCMSD's capital expenditures have been paid "out of pocket." During the 1995–96 fiscal year, the capital construction outlay totaled $50 million. While this requires a large expenditure up front, it also means that the KCMSD will have to pay less for debt service in future years. (Testimony of McKelvey, Tr. at 1620).

The KCMSD contends it is in the best interest of the KCMSD for the Court to approve the Agreement. Specifically, the KCMSD points out that of the $73,338,887 paid by the State in Fiscal Year 95, almost 80% ($58,209,975) was spent on programs intended to reduce racial isolation: the magnet plan and magnet transportation. The KCMSD admits the racial isolation vestige is near elimination. Testimony of a KCMSD witness indicated that any remaining racial isolation vestige could be rectified in two years. (Testimony of Stolee, Tr. at 2011). The State argues that the KCMSD is already unitary with respect to the racial isolation vestige considering the constraints imposed by the demographics. (Testimony of Rossell, Tr. at 88). Under *Freeman v. Pitts,* 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992),

court-supervision and court-ordered funding may be withdrawn in stages as partial unitary status is achieved. Believing that the grant of unitary status was near for the vestige of racial isolation, the KCMSD reasoned that it should lock in more money than it could hope to obtain through continued litigation and negotiated with the State to arrive at the funding amount to be paid by the State if the Agreement is approved.

Further, *Jenkins III* admonishes this Court to remember not only that the State obligation for the quality education programs has always been limited to funding, but also many of the goals of the quality education programs have been reached. The major portion of State funds not devoted to magnet programs and transportation is used for funding the Milliken II programs, which are the quality education components.

■ The plaintiffs charge that this Court has no authority or jurisdiction to approve the Agreement. The Court would remind the plaintiffs that the principles of a desegregation remedy require a "practical flexibility." *Brown v. Board of Education,* 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (*Brown II*). The plaintiffs maintain that the principles of joint and several liability force the Court to freeze the status quo until the declaration of unitary status. However, "a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." *System Federation No. 91 v. Wright,* 364 U.S. 642, 647, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961). The Eighth Circuit has held that a federal court has "inherent jurisdiction in the exercise of its equitable discretion and subject to appropriate appellate review to vacate or modify its injunctions." *Booker v. Special School District No. 1,* 585 F.2d 347, 352 (8th Cir.1978), *cert. denied,* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 878 (1979).

Rule 60(b)(5) of the Federal Rules of Civil Procedure provides that "the court may relieve a party ... from a final judgment [or] order" because "it is no longer equitable that the judgment should have prospective application." The State has contributed almost $1.2 billion to the KCMSD. The KCMSD used those funds to build new facilities and remodel old ones. A major portion of the funding responsibility for the quality education components of the remedy fell upon the State. A majority of those programs are now in place. While the Court feels that the State has been more litigious than necessary and the remedy may have achieved better results had the State chosen to be more cooperative, it is clear that the State has contributed large sums of money to the KCMSD. Additionally, the State has now offered to pay a considerable amount to provide the KCMSD transition funding as it attains self-sufficiency. Finally, approval of the Agreement may encourage legislative action to provide equitable funding for the KCMSD, once the State is relieved of the desegregation funding obligations.

Considering the above findings as to unitary status and the limited time that is required for the KCMSD to remedy the remaining vestiges, the Court feels that any remaining obligation of the State to the school children of Kansas City may be discharged by the payment of the funds provided for in the Agreement. Equity requires a modification of the earlier remedy prescribed by this Court. Following the pronouncement in *Jenkins III,* the Court observes that the State has been responsible for the funding, not the implementation of the desegregation programs. The Court declares that the joint and several liability finding is therefore modified to individual liability of the KCMSD. The State's obligation shall end and the State will be entitled to an Order from this Court dismissing the State from this action when the State has paid the sums provided for in the Agreement.

## V. Modifications of the Remedy Relating to the KCMSD

### A. *Introduction*

If circumstances change, the Court possesses the equitable power to modify the injunction originally imposed. No world may stay frozen in time. The State and the

KCMSD committed serious constitutional harms some years ago. This Court's responsibility lies in restoring state and local control as soon as possible when the vestiges of the prior discrimination have been remedied to the extent practicable. *Jenkins III*, 515 U.S. at ——, 115 S.Ct. at 2056. An inspection of the KCMSD reveals a much different school system than the system that confronted this Court almost twenty years ago when the plaintiffs first filed their complaint. No longer do minority residents of the KCMSD occupy a subservient role to a white majority. The Kansas City Missouri School Board presently includes six minority members—a full two-thirds of the School Board—including the President of the Board of Education. Gone too are the decaying buildings, the segregated students forced to use only handed-materials. New and renovated classrooms greet the students and teachers of the KCMSD today.

While the Court remains proud of the innovations it ordered and the strides the KCMSD has taken, the circumstances of the KCMSD today also bring sadness. This Court afforded the KCMSD an opportunity to achieve goals unimaginable in most school districts. A large amount of the money spent in the District has indeed resulted in tangible benefits, such as new and renovated schools, an increased number of computers, higher technology available to all students, and intervention programs to help impoverished children. However, after examination of the exhibits in this hearing, as well as exhibits from the June, 1996 hearing on the budget, the Court cannot fail to see excess expenses in the top-heavy administration in the KCMSD. While extra expenses could be justified with superior performance, the KCMSD presents an opposite picture: large expenses and inadequate performance in many areas.

The Court does not mean to suggest that the District has achieved nothing over the course of this litigation. The KCMSD instituted massive directives to implement magnet schools and attract non-minority students. The KCMSD has employed many highly competent people over the course of this Court's involvement with desegregating the District. Additionally, any school district would find it difficult to overcome some of the obstacles the KCMSD has faced. The transient nature of the leadership within the KCMSD administration provides a formidable barrier. Ten people have occupied the position of superintendent of the KCMSD in nine years. However, not even the changes in leadership can explain some of the performance deficiencies in the KCMSD.

The matters addressed below are not intended to be findings of fact and played no role in the Court's opinion as to the approval of the Agreement or the existence of a unitary school system within the KCMSD. Instead, the Court wishes to identify some of its concerns about the current status of the KCMSD. The District's recent performance has been dismal at best:

1. The KCMSD still lacks a comprehensive, integrated educational and instructional plan. In its July 15, 1996 Order, this Court expressed its frustration at the KCMSD's continued slow movement in the creation of an instructional plan. The Court directed the KCMSD to place completion of the plan as its top priority. Yet at the January, 1997 hearing on unitary status, the Deputy Superintendent of Educational Services of the KCMSD testified as to the intended date for KCMSD's submission of a plan: "I believe it's March 1st. I think it's March 1st or April 1st. I can't remember the exact date."

2. The District's fragmented efforts to implement meaningful staff development have fallen far short of the mark. While there is some good teaching and learning going on in KCMSD schools, there is a great deal of poor teaching and little learning in many schools. Only five elementary schools, one middle school, and one high school within the KCMSD meet or exceed the statewide average on the Missouri Mastery and Achievement Tests (MMAT).

3. On-going administrative instability has plagued the District for years, resulting in a lack of accountability for deficiencies. Individual schools have seen similar high

turnover rates for principals. Essential programs for improvement attain only a continual state of limbo, awaiting the next KCMSD administration to modify the plans. An instructional plan that overcomes this instability is essential to attain a quality education for all students.

4. The KCMSD still lacks a security plan. The Desegregating Monitoring Committee (DMC) identified safety and security as a major concern last year. The Court ordered a plan to be completed by February 14, 1997. The KCMSD did submit some broad statements of security policy and informed the Court that work was continuing on a final product that consisted of input from many groups. It is a sad commentary, however, that based upon this Court's experience with the KCMSD, without further reminders and demands from the Court, the security plan may be delayed for a substantial length of time. A safe and secure school is an absolute prerequisite for a successful school.

5. The KCMSD is unable to supply a budget for a particular fiscal year, reconciled with actual expenditures for specific line items. The purpose of a budget is to plan for upcoming expenses and only deviate from that budgeted amount for good cause

The KCMSD, however, appears to simply throw large sums into various accounts, allowing departments to either exceed the budgeted amount by a huge sum, or not use significant portions in that account. This lack of true budgeting makes identifying how much money the District actually needs to operate extremely difficult.

These deficiencies in performance cannot be blamed on a lack of financial resources. While many of the remedies imposed by this Court require larger expenditures than some school districts, the KCMSD has an operating budget that *far exceeds* the budgets of other school districts. (State Ex. 164). The first table below shows the amount spent in districts approximately the same size as the KCMSD. The figures shown for the total operating expense were calculated by multiplying the enrollment by the per pupil amount shown in the exhibit. The amount shown for the KCMSD excludes any expenses for capital expenditures. The operating expense column based on dollars spent per pupil does not factor in the cost of living within that particular district. Therefore, the next column calculates the operating budget, adjusting the budget depending upon the cost of living within that district.

| District | Enrollment Fall/1993 | Student–Teacher Ratio | Percent Minority | Operating Budget/ $/pupil | Operating Budget/Real $ per pupil |
|---|---|---|---|---|---|
| Montgomery Co. Ala. | 35,244 | 17.7 | 64.7 | $107,317,980 | $120,569,720 |
| Stockton City, Cal. | 34,337 | 23.1 | 81.3 | $179,548,170 | $161,315,220 |
| Chatham Co. Ga. | 35,358 | 15.9 | 62.1 | $167,101,900 | $183,437,300 |
| Richmond Co. Ga. | 35,422 | 17.2 | 64.7 | $143,423,670 | $157,450,790 |
| **Kansas City, Mo.** | 36,599 | 12.7 | 75.5 | $304,357,280 | **$329,025,010** |
| Oklahoma City, Okla. | 38,052 | 17.0 | 60.0 | $157,230,860 | $177,855,040 |
| Alief ISD, Texas | 33,315 | 16.7 | 73.2 | $122,232,730 | $135,825,250 |

The next table shows districts somewhat smaller than the KCMSD, so the actual dollar per pupil column is excluded, replaced by another column that reflects what the district would incur in operating expenses if it were the same size as the KCMSD:

| District | Enrollment Fall/1993 | Student–Teacher Ratio | Percent Minority | Operating Budget/Real $/pupil | Budget Adjusted for Size: Real $ |
|---|---|---|---|---|---|
| Little Rock, Ark. | 25,543 | 15.7 | 66.9 | $141,687,020 | $182,776,250 |
| Bakersfield, Calif. | 26,366 | 24.7 | 71.4 | $ 96,578,658 | $123,620,680 |
| Fontana, Calif. | 29,764 | 26.8 | 68.9 | $118,163,080 | $141,795,690 |
| Springfield, Mo. | 24,632 | 18.0 | 6.3 | $101,533,100 | $135,039,020 |

The Court is aware that some of these school districts are not operating under a desegregation order, and of those that are, perhaps the constraints imposed by the courts are different than those of the KCMSD. It cannot go unnoticed, however, that the KCMSD figure surpasses other districts by a substantial amount, even considering those differences.

When examining the KCMSD budget for 1996–1997, several items attract attention. First, the sheer size of the administrative budget appears lavish. One is struck first at the number of the many departments. The following table depicts employees of the KCMSD who are not teachers, principals, or the support staff at the various schools. It also excludes special education teachers and administrators, alternative education teachers, gifted and talented teachers, and the food service employees:

### NON-TEACHING POSITIONS, EXCLUDING FOOD SERVICE

| Department | No. of Persons | 1996–97 Budgeted Salary |
|---|---|---|
| Board Services | 2 | $56,983 |
| Chief Exec. Officer (Superintendent) | 6 | $307,842 |
| Director, Public Information | 11 | $393,301 |
| Legal Counsel | 3 | $166,731 |
| Internal Auditor | 4 | $165,638 |
| Admin. Hearing Officer | 6 | $206,213 |
| District Legal Counsel M/WBE | 1.28 | $77,315 |
| Information Systems | 43 | $1,795,109 |
| Assoc. Super./Human Resources | 6 | $201,908 |
| Recruiting & Staffing | 9 | $314,828 |
| Employ. Relations | 2 | $80,936 |
| Employ. Service | 7 | $171,359 |
| Compensation & Classification | 2 | $54,876 |
| Assoc. Sup. of Transportation | 26.30 | $712,352 |
| Chief Instructional Officer/Deputy | 5 | $296,215 |
| Ass't Sup./Educ. Support Services | 6 | $205,488 |
| Director/Spec. Education | 6 | $318,922 |
| Teacher Support Proj. | 2 | $23,634 |
| Coordinator/Pupil Services | 2.75 | $102,259 |
| Athletics & Activities/Instruct. Admin. | 2 | $75,848 |
| Military Science/Instruct. Admin. | 2 | $80,439 |
| Director/Curriculum Development | 26 | $1,191,021 |
| Director/Instruct. Services | 19 | $743,138 |
| Spec. Lib/Media Service/Instruct. Admin. | 8 | $187,787 |
| Textbook Depository/Instruct. Admin. | 8 | $202,967 |
| Parenting Resource Center/Instruct. Admin. | 3 | $86,747 |
| School Community Partner/Instruct. Admin. | 1 | $53,398 |
| Human Relations | 3 | $129,839 |
| Assistant Superintendents (Maint./Cust./Sec.) | 6.5 | $251,580 |
| Maintenance—Supervision | 141 | $3,637,678 |
| Custodial Services | 418 | $8,239,414 |
| District Engineer | 2 | $69,644 |
| Safety & Security | 119 | $2,581,486 |
| CIP Oversight | 4 | $143,602 |
| Environmental Services Dept. | 2 | $73,559 |
| Dir./Admissions | 14 | $437,415 |
| Assoc. Supt. Planning | 2 | $109,255 |
| Dir. Deseg. Planning | 10 | $431,670 |
| Assoc. Supt./Business & Finance | 2 | $115,062 |
| Benefits/Risk Mgt. | 5 | $163,220 |
| Dir. Budget/Fiscal Planning | 18 | $671,763 |
| Dir. Acct. & Investments | 35 | $1,105,619 |

| Department | No. of Persons | 1996–97 Budgeted Salary |
|---|---|---|
| Dir. Purchasing | 13.80 | $517,634 |
| Warehousing | 19.30 | $465,506 |
| Mail Dist/Dupl. Center | 5 | $102,701 |
| | 1,038.93 | $27,519,901 |

The total spent on salaries for these departments do not reflect the total amount actually budgeted for those departments. Miscellaneous line items for "other professional services," "other purchased services," or "repair and maintenance" contain a significant amount of expenditures as well.

A further modification of the data above is required to calculate the number of people an average person might consider as an "administrator" rather than a "worker." Of course, the Court's rough definition does not coincide with the District's. Criticism has been leveled at the KCMSD, however, because of its top-heavy administration, which requires a broad definition instead of a narrow one. When the "workers" are subtracted from the total above, the remaining "administrators" total 404.93. However, the list above includes the "clerical" positions in each of the departments. Subtracting the total of clerical staff (57) who work in each of the above departments leaves the count at 347.93. Adding the principals and vice-principals from the various schools, the approximate number of "administrators" that the KCMSD increases to 564.93. The KCMSD lists 363.5 as the number of administrators in its budget document that was submitted as evidence in the June, 1996 hearing. (1996 KCMSD Ex. 13). That exhibit was also utilized for the figures in the table above. The Court is sure that the root of the discrepancy in the two figures probably lies in the Court's definition, but the concern about the number of administrators employed lingers.

A comparison with another school district similarly reveals distressing figures. The Court requested a budget document from the Springfield Missouri School District, which has an enrollment of approximately of 24,000 students. The enrollment of the KCMSD is approximately one third larger than the Springfield schools. The table below depicts a rough comparison between the two districts of the number of persons employed in various categories. The middle column contains the Springfield personnel number for that category increased by 33%, in order to give a rough approximation of the effect of the size differential between the two districts. The table excludes "clerical" staff from all KCMSD figures for a particular category. The "teacher" category does not include music, art, or physical education teachers, which are considered "itinerant" positions, sometimes moving between schools. Further, the KCMSD does not actually operate its own transportation service. The Springfield District owns and operates its own fleet of school buses. The figures in this table relating to transportation obviously reflect only the administration figures in Springfield:

| Category | Springfield | Spfld. + 33% | KCMSD |
|---|---|---|---|
| Accounting | 3.00 | 3.99 | 63.80 |
| Data Processing | 5.00 | 6.65 | 42.00 |
| Human Resources | 1.00 | 1.33 | 19.00 |
| Transportation (Admin. only) | 2.00 | 2.66 | 20.30 |
| Teachers (not including itinerants) | 1111.15 | 1477.83 | 2496.28 |
| Building Services (Maint./Custodial) | 219.50 | 291.94 | 531.00 |

The Court realizes that the KCMSD must employ extra staff to comply with the desegregation remedy and raw comparisons such as this are inherently fraught with inequities.

However, the above disparities remain alarming even taking the desegregation staffing into account and factors that the KCMSD must face that the Springfield District does not, such as a large minority enrollment. Many witnesses at the hearing expressed concern at the size and inefficiencies of the KCMSD administration.

The Court's main goal in ordering the remedy it imposed was to benefit the children of the KCMSD through better buildings, as well as better teaching, to provide an increased quality of education. The better buildings are in place. The KCMSD has teaching resources available that most districts lack. · When dividing the total enrollment of each school by the number of teachers assigned to that school, the KCMSD's student to teacher ratio is amazingly low. (KCMSD Ex. 29). The student-teacher ratio in the elementary schools ranges from a low of 8.62 students per teacher to a high of 18.43 students per teacher. The range of student-teacher ratios in the middle schools is 10.3 to 14.83. The high school range is from 12.59 to 17.3 students per teacher. Upon closer examination, however, the actual class sizes climb dramatically. The total number of teachers assigned to a particular school includes the itinerant teachers, the special education teachers, resource teachers, and content teachers. Because these teachers are added to the total number of teachers assigned to a particular school, this artificially decreases the student-teacher ratio.

When the Court requested additional information from the KCMSD regarding its class sizes, a different picture emerged. More common class sizes at the elementary school level ranged between 22–28 than between 11–17. Many elementary classes had enrollments of 28 and 29, rather than the state desirable standard of 20 students for K–2, 22 students for 3–4, and 25 students for 5–6. A first-grade class at Carver had 38 students enrolled, while one first-grade class at Troost showed an enrollment of 69. At Graceland and Richardson, 40 and 46 students were enrolled in second-grade classes, respectively. A third-grade class at Ladd had an enrollment of 42, and several kindergarten classes carried an enrollment ranging in the forties to the seventies. The data from the middle and high schools presents mixed results. The class size ranges in many schools are below the desirable ratios that DESE sets forth in its Missouri School Improvement Plan (MSIP) standards. The number of students that each teacher sees, however, often exceeds the state level of 125. At the middle-school level, even more teachers suffer an increased teaching load. Most middle schools have teachers who are responsible for teaching six classes per day, which often causes them to teach between 135–140 students. Achievement levels of minority students begin their precipitous decline at the middle-school level.

Further, teaching loads seem to vary from school to school. At Central High School, most teachers have only three classes per day, while the other schools have either five or six classes per day. A corresponding gain in achievement at Central because of the decreased teaching responsibility of the staff does not occur. The opposite is true. Central has lower scores on the MMAT, for instance, than Van Horn High School, at which teachers are responsible for six classes per day.

The Court has tediously listed the above figures to demonstrate its grave concern for the future direction of the Kansas City Missouri School District. The KCMSD must come to grips with fiscal reality. That reality is approaching within a very short time frame. The Supreme Court has mandated that desegregation remedies should be temporary, not permanent. *Jenkins III*, 515 U.S. at ——, ——, 115 S.Ct. at 2038, 2049. The KCMSD must begin to move decisively so that it can be ready to stand on its own in the near future. It cannot continue to spend money on either excess or incompetent personnel. The KCMSD must instead effectively educate its students, as well as provide a safe and secure environment for both students and teachers.

### B.   *Modification of the Remedy*

The constant changes in leadership of the KCMSD affords little hope that the concen-

trated efforts that are required of the District has any hope of succeeding. The Court, therefore, orders a modification of the remedy in an effort to overcome this instability of leadership. The Court believes that the KCMSD requires help with some demanding decisions in the near future. The District must trim its budget, as well as its staff. The Court readily admits it has no educational expertise and has only identified general areas of worry. A strong hand is needed to guide the District through the difficult waters that lie ahead. Because of the KCMSD's troubled past, the District has lost the confidence of many of its staff, students, parents, and the community at large. Continual change frustrates the teaching staff, which in turn complicates acquiring teachers' cooperation in the efforts needed to increase the educational quality of the KCMSD. Already low achievement scores have fallen in the last year or two and the debacles of the School Board have provided near constant fodder for the news media.

While the Court has released the State from any further obligations in this case except for the payment of funds as provided for in the Agreement, the Court has a high regard for Dr. Robert Bartman and the Department of Elementary and Secondary Education (DESE), now under his direction. In the post-hearing briefs submitted to the Court, the Plaintiffs have requested the close collaboration of DESE to share its expertise with the KCMSD to pursue the goals set out by the Court. The KCMSD has also said it would welcome this close collaboration with DESE. Dr. Bartman testified that DESE would provide any help requested to the KCMSD.

The Court, however, desires more than a close cooperative effort between DESE and the KCMSD. The Court would like to place DESE in a position of overseeing the KCMSD through this transition phase. The Court envisions that the KCMSD will have a transition plan submitted to the Court by the beginning of school in the fall of 1997. Dr. Stolee stated he thought the planning of the implementation could be completed in that school year. The time period set forth by the Court for the remaining vestiges to be completed will afford the KCMSD two years of implementation.

With the approval of the Agreement, and a short time span allotted by the Court to cure the remaining vestiges, the KCMSD must move quickly and correctly to get its financial affairs in order. The Court believes that the administration of the KCMSD is not up to this task. Not only do superintendents come and go with too great a frequency, but difficult decisions will have to be made on where to cut the budget. In the past, the KCMSD administration has found much to cut in the way of school services, but little in the area of administration. Further, while teaching staff may need to be cut, the Court feels that a strong hand with educational expertise and no "vested interest" is essential to accomplish the difficult goals in this transitory period. DESE and Dr. Bartman have both the educational expertise and the familiarity with the history of the KCMSD desegregation effort to provide guidance through this transition period. But let the Court be clear, this is not mere "guidance" that the Court is seeking. The Court is asking DESE to give approval before KCMSD decisions are made about the necessary budget cuts. As the State pointed out countless times during the hearing, it has spent a considerable amount of money on this desegregation effort. Under the Agreement approved by the Court in this Order, the State still remains obligated for a large sum to be paid to the KCMSD. The Court feels that the State should have a hand in saying how its money is being spent.

The Department of Elementary and Secondary Education (DESE) of course has an obligation to ensure a quality of education for all of the state's citizens. The Revised Missouri Statutes provide that the Department should "seek in every way to elevate the standards and efficiency of the instruction given in the public schools of the state." RSMo. § 161.122 (1991). This Court will appeal, however, to the Department's and Dr. Bartman's sense of duty to help the state's second largest school system, now floundering, and in desperate need of DESE's educational expertise.

The Court cautions that any involvement in the operation of the KCMSD by the State Attorney General's office would be inappropriate because of the long litigious nature of the relationship between that office and the KCMSD. If DESE and Dr. Bartman decline the Court's appeal, then the Court would seek DESE's help in finding a Special Master to oversee the KCMSD. Time is of the essence and the Court would urge DESE to act with all due haste. The Court hopes that this procedure will not be necessary, however.

The Court feels that it would be inappropriate for the Court to impose any constraints on this management effort from DESE. Dr. Murphy and Dr. Stolee presented excellent testimony at the hearing concerning what direction the KCMSD could take to maintain the integrity of the desegregation programs as much as possible considering the imposition of budget restrictions. The Court would urge DESE to examine Dr. Stolee's transition plan to see if it is viable for implementation in the KCMSD. Other general areas of concern include the budgeting process itself and increased class sizes. The Court discussed both of those problems above. The only order that this Court will impose upon the KCMSD now concerning those matters is that the budget should be redesigned to reconcile actual expenses with budgeted expenses for every line item. Other matters are best left to the discretion of DESE and Dr. Bartman.

While the Court does not possess a crystal ball and, therefore, is unable to say with absolute certainty if the KCMSD will have attained unitary status within the three-year time period that the Court has given it to eliminate the remaining vestiges, the Court feels that the three-year period is a reasonable time frame for the KCMSD to accomplish its work. Even the KCMSD witnesses testified that two to three years was appropriate to eliminate some of the remaining vestiges, while other witnesses said that three to five years would be required for other programs. This Court feels that three years should be enough for all the implementation to be completed. At the end of three years, the KCMSD should plan on being entirely self-sufficient, even if that means regressing to a $2.75 levy. The Court will repeat that it is not the federal court system's responsibility to ensure funding. That is the province of the state legislature and the voters of the District.

One final word: as the parties know, this is the last time that this Court will hear matters involving this case, The Court is aware that the appeal process is sometimes long, therefore often delaying the official implementation of the lower Court's order. This Court urges the KCMSD to act for the good of the children entrusted to its care and not wait until the final appeal has been heard to begin working on trimming its budget in a serious fashion and preparing for the future. The focus of the District must be on improving the quality of education for its students. This will require the dedication of the KCMSD's administration, teachers, parents, and community. A delay will serve no interests except self-serving ones of the KCMSD. The future is in the children.

Accordingly, it is

ORDERED that the KCMSD reduce its achievement gap by 2.6 NCE's within three years; and it is further

ORDERED that the KCMSD attempt to achieve by all practicable measures a plus or minus range of 15% in 80% of its elementary schools within three years; and it is further

ORDERED that the KCMSD file a transition plan with the Court no later than August 15, 1997; and it is further

ORDERED that the KCMSD modify its budgeting process so that actual expenditures may be reconciled with the budgeted amounts for each line item by department; and it is further

ORDERED that the State's Motion for Unitary Status is denied as to the educational vestige, the assignment of students and faculty, facilities, and transportation; and it is further

ORDERED that the State's Motion for Unitary Status is granted as to extracurricular activities; and it is further

ORDERED that the State's Motion for Approval of the Agreement with the KCMSD is granted and the State will be dismissed from this action upon the payment of the amount designated in the Agreement.