# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 00-1048
No. 00-1288

_____

Chinyere Jenkins, by her next friend,    *
Joi Jenkins; Nicholas Paul Winchester-    *
Rabelier, by his next friend, Paula    *
Winchester; Margo Vaughn-Bey, by her    *
next friend, Franklin Vaughn-Bey;    *
Nicholas C. Light, by his next friend,    *
Marian Light; Stephon D. Jackson, by    *
his next friend, B. J. Jones; Travis N.    *
Peter, by his next friend, Debora Chadd-    *
Peter; Leland Guess, by his next friend,    *
Sharon Guess,    *
   *
      Plaintiffs - Appellants    *
   *    Appeals from the United States
American Federation of Teachers,    *    District Court for the Western
Local 691,    *    District of Missouri.
   *
      Intervenor - Appellee    *
   *
      v.    *
   *
State of Missouri; Mel Carnahan,    *
Governor of the State of Missouri; Bob    *
Holden, Treasurer of the State of    *
Missouri; Missouri State Board of    *
Education; Peter Herschend, Member of    *
the Missouri State Board of Education;    *
Thomas R. Davis, Member of the    *
Missouri State Board of Education;    *
Robert E. Bartman, Commissioner of    *

Education of the State of Missouri; Rice   *
Pete Burns, Member of the Missouri   *
State Board of Education; Sharon M.   *
Williams, Member of the Missouri   *
State Board of Education; Betty Preston, *
Member of the Missouri State Board of   *
Education; Jacquelline Wellington,   *
Member of the Missouri State Board of   *
Education; Russell Thompson, Member   *
of the Missouri State Board of   *
Education,   *
  *
      Defendants   *
  *
School District of Kansas City;   *
Benjamin Demps, Jr., Superintendent,   *
School District of Kansas City,   *
Missouri; John A. Rios, School Board   *
President; Patricia Kurtz, School Board   *
Member; Lee Barnes, Jr., School Board   *
Member; Lance Loewenstein, School   *
Board Member; Sandy Aguire Mayer,   *
School Board Member; Elma Warrick,   *
School Board Member; Fifi Bliss   *
Weideman, School Board Member,   *
  *
      Defendants - Appellees.   *

_____

Submitted: February 22, 2000

Filed: February 29, 2000
_____

Before McMILLIAN, HEANEY, and JOHN R. GIBSON, Circuit Judges.
_____

JOHN R. GIBSON, Circuit Judge.

The Jenkins class, representing the children of the Kansas City, Missouri School District in this school desegregation case, has appealed the district court's order declaring the district unitary and dismissing the case with prejudice. The order followed a hearing set by the court to consider KCMSD's amended motion for equitable relief from a ruling of the Missouri State Board of Education declaring that the accreditation of KCMSD would be withdrawn effective May 1, 2000. After the district court denied KCMSD's motion, it proceeded sua sponte to a discussion of the unitary status of the district and declared the district to be unitary. We reverse and remand.

We need not discuss in detail the long history of the Kansas City school desegregation litigation. After a finding of constitutional violations, years of effort to remedy them, and extended litigation and appeals which we need not catalog, the State of Missouri moved for a declaration of unitary status. On March 27, 1997, Judge Russell Clark, who had presided over the case since its filing, granted the motion in part, but denied it in part. See Jenkins v. Missouri, 959 F. Supp. 1151(W.D.Mo.), aff'd, 122 F.3d 588 (8th Cir. 1997) (Jenkins XIV). In particular, Judge Clark held that twenty-six percent of the achievement gap of ten normalized curve equivalents between KCMSD's black and white students was a vestige of the constitutional violation, and he ordered KCMSD to eradicate that vestige within the next three years. Id. at 1157-65, 1179. At the same time, Judge Clark approved a settlement between KCMSD and the State, providing that the State would pay KCMSD $320 million over three years, and in return, would be dismissed from the litigation. Id. at 1180.

On January 28, 1999, the district judge who succeeded Judge Clark to supervision of the case entered an order declaring that the State had paid its obligation under the settlement and dismissing the State from the case. Order of January 28, 1999. The court said that the State must continue to comply with any obligations that it undertook during the course of the lawsuit that were not covered by the agreement

and warned the State against taking any action that might prevent KCMSD from ultimately fulfilling its court-ordered remedial goals. Id. at 6. The court then pointed to Judge Clark's order giving KCMSD three years to eliminate all the remaining vestiges of segregation; the court commented that fifteen months remained on this time line. Id. After considering the "lengthy and litigious process" likely to attend a renewed motion for unitary status, the court directed the parties to prepare for a unitary status hearing to begin on January 3, 2000. Id.

Counsel appeared before the court on August 24, 1999 for a scheduling conference, which the court stated was "to address . . . preparing for a unitary status hearing in January," specifically what evidence the parties anticipated presenting in the hearing. Counsel for the class suggested delaying the hearing. He said that it would be difficult for KCMSD to make a case that everything practicable had been done, because there was a "pretty widely shared agreement that this is not the case." Furthermore, some test data were not in, and others seemed to show the achievement gap had not been closed. Nor had KCMSD implemented the curriculum, professional development, and accountability plans designed to close the gap. Also, KCMSD had just hired a new superintendent. The class's counsel suggested a hearing in the late summer of 2000.

The court then pointed to Judge Clark's statement that gave the district three years to eliminate the vestiges of discrimination, and stated he "believed the Supreme Court when they told me to get this school district returned to local control," and that both he and Judge Clark had given KCMSD three years to comply.

Counsel for the class pointed out that recently the monitoring had been less heavy-handed, and that the monitoring committee, which was commonly referred to as the DMC, had been sending things back to the new superintendent to handle. Counsel said there were many ways the committee could lighten its monitoring. Counsel for the

class stated that he did not anticipate that he would be presenting new approaches or anything other than implementation of the five programs already planned for reducing the black-white achievement gap: the curriculum, classroom practices, professional development, assessment, and accountability plans.

The district court then stated that he sensed that both the class and KCMSD were "pretty satisfied that the school district can't . . . go forward with the burden of proof that the gap has narrowed."[1] He said he would need to have a hearing to take testimony from one of the experts who testified at the earlier unitariness hearing and also to hear whether the district was "on track" in implementing the five programs. The court commented that the problem had been the delay in implementation of the five plans to reduce the achievement gap. The court further commented that the track record of the district had not convinced him that KCMSD was putting heart and soul behind implementing the five areas or that KCMSD could get out of the political mode and get into looking for the best interests of the children.

Following this conference, the court filed a written order formally denying the motion for a continuance, stating:

> [T]he Court provided for termination of the [DMC] by March 25, 2000. See Order at 21, Doc. # 4575 (August 21, 1997), . . . . [E]ven if the KCMSD has not attained unitary status, all three Monitors would be removed. See id. At that time, the Court would need to determine the need for new Monitors or even a new remedial structure. Such a

---

[1]This statement came after the following exchange. When the class counsel said in court there was "widely shared agreement" that KCMSD had not done everything practicable to eradicate the achievement gap, KCMSD did not object to this representation. KCMSD's counsel said: "[W]e have a sense at the moment . . . that the district would have an uphill fight in January."

determination cannot be made without evidence of the KCMSD's current status.

Order of August 26, 1999 at 17-18 (emphasis added).

On October 21, 1999, the State Board of Education voted to withdraw accreditation of KCMSD as of May 1, 2000. In response, KCMSD filed an amended motion for equitable relief on October 25, 1999, seeking to bar the State's action on the ground that it would interfere with the remedial decree in Jenkins. That same day, the court issued an order setting KCMSD's motion for hearing on November 1 to hear evidence on three enumerated issues: whether the court should (1) rejoin the State as a party; (2) declare void ab initio the action of the Missouri State Board of Education in classifying KCMSD as an unaccredited school district; and (3) enjoin the application to KCMSD of several statutes on which the State Board's action was based.[2]

The court held the hearing on KCMSD's motion on November 1-2, 1999. We need not discuss in detail the testimony before the court, except to state that it was directed to the issues outlined by the district court in its order of October 25. The parties agreed in oral argument before us that the hearing was not a unitary status hearing. At the conclusion of the proceedings of November 2, the court asked KCMSD's staff counsel whether the KCMSD board agreed there should be a unitary status hearing in January. Counsel responded that the board voted unanimously to seek a continuance and authorized her to agree to a continuation of the monitoring committee in its current configuration until the end of the 1999-2000 academic year in June.

---

[2]In KCMSD's motion for relief from the de-accreditation action, it asked the court to stay the de-accreditation until the five remedial plans had been fully implemented.

On November 9, 1999, KCMSD filed a written motion requesting a continuance of the unitary status hearing set for January 3, 2000, and consenting to continued supervision by the DMC. KCMSD further suggested that it would be appropriate to extend the term limits of the DMC beyond March 25, 2000, and to set a hearing at the end of the academic school year, June 3, 2000, to assess the role of the DMC and consider a reduction in the scope of the oversight by that body in the future.

On November 17 the district court issued an order denying KCMSD's request to rejoin the State as a party and refusing to declare void ab initio the action of the State Board of Education classifying KCMSD as an unaccredited school district.[3] After ruling on the motion before it, the court proceeded sua sponte to consider the issue of whether the district was unitary. In light of the nature of our ruling, it is not necessary that we set out in detail the substance of the court's reasoning. Suffice it to say that, much to the parties' surprise, the court ended by declaring that the KCMSD had achieved unitary status. The court dismissed the case with prejudice.

**I.**

We first consider whether the district court erred in determining KCMSD to be unitary and dismissing the case without taking evidence or hearing arguments on the issue.

In January 1999 the court scheduled a hearing on unitary status for January 2000, and both in a conference with counsel and a written order in August 1999 commented

---

[3]The district court's ruling on the de-accreditation question is not before us. The State argued before the district court that the action of the State Board of Education is effective May 1, 2000 and that the KCMSD has not exhausted its administrative remedies. KCMSD conceded that its administrative appeal rights were not yet exhausted and were not yet ripe.

specifically on the necessity for a hearing to evaluate what continuing judicial involvement would be required. The order setting the November 1-2, 1999 hearing limited that hearing to the issues of whether the State should be rejoined as a party and whether the de-accreditation order should be declared void ab initio. The transcript discloses that the testimony and evidence at the hearing were directed to these issues. The court's inquiry at the conclusion of the November 1-2 hearing as to whether there should be a unitary status hearing in January demonstrates that the court did not consider it had conducted such a hearing. KCMSD's counsel's response to this inquiry by the court and its written motion filed November 9, 1999 for a continuance of the unitariness hearing demonstrate that KCMSD did not consider that there had been a hearing on unitary status.

It is evident from what we have said above that KCMSD did nothing to contest the Jenkins class's statements that neither KCMSD nor the class were ready to move forward and establish that KCMSD was unitary, and the judge acknowledged as much. From this and from the court's order limiting the proof at the November 1-2 hearing, the Jenkins class as well as KCMSD went into the hearing with no expectation that unitary status was an issue to be tried.

In Jenkins XIV we held, based upon abundant Supreme Court authority, that once there has been a finding that a defendant established an unlawful dual school system in the past, there is a presumption that current disparities of the sort listed in Green v. County School Board, 391 U.S. 430, 435 (1968), are the result of the defendant's unconstitutional conduct. See Jenkins XIV, 122 F.3d at 593. Therefore, the burden of proving unitariness rests on the constitutional violator. Id. at 593-95. Our statement in Jenkins XIV found support in Freeman v. Pitts, 503 U.S. 467, 494 (1992), where the Supreme Court stated with respect to racial imbalance in student attendance caused by the unlawful policy of a school system, "The School District bears the burden of

showing that any current imbalance is not traceable, in a proximate way, to the prior violation." Other statements in Freeman similarly recognized that the burden was on the district to demonstrate a good faith commitment to compliance with the desegregation plan. Id. at 498-99. This presumption places the burden in any hearing on unitary status on KCMSD, including the issue of reduction in student achievement and the achievement gap, and it admittedly made no attempt to demonstrate that unitary status had been achieved.[4]

This court stated in Booker v. Special School District No. 1, 585 F.2d 347, 352 (8th Cir. 1978), "There is no question that in a proper case a federal district court that has issued an injunction may vacate it or modify it if it is established that to continue it in force or without modification would work an inequitable result." (emphasis added.)

The Seventh Circuit faced a nearly identical situation in United States v. Board of School Commissioners, 128 F.3d 507 (7th Cir. 1997). There, the Board of School Commissioners of the Indianapolis Public School District requested that the judge lift an injunction requiring busing of public school students on the ground that the district had achieved unitary status.[5] The district court declined to address the issue of unitary

---

[4]In Jenkins XIV, we pointed to the finding of the district court in the first remedial order decisions that "the inferior education indigenous of the state-compelled dual school system has lingering effects in the Kansas City, Missouri School District." 122 F.3d at 594. We also quoted a later finding, "Segregation has caused a system wide reduction in student achievement in the schools of the KCMSD." Id. (emphasis in original). The district court found that the adverse effect on minority student achievement still persisted in 1997 in the form of an achievement gap; we held that finding was not clearly erroneous. 122 F.3d at 597-99.

[5]The Seventh Circuit's opinion stated that the district wanting to phase out can be permitted to do so only by presenting evidence that the existing order had outlived

status, but modified its existing order by extending the busing to kindergartners, an issue that had not been raised by the parties. The Seventh Circuit, in an opinion by Chief Judge Posner, stated:

> No one asked the judge for this modification; there was no hearing on it. As a result, there is nothing in the judge's order, or in the record on which it is based, about the respective kindergarten programs, facilities, and capacities in the transferor and transferee areas or about the appropriateness of compelling the busing of such young children against their parents' wishes and whether they are to be in the same buses with much older children.

128 F.3d at 512. In support of the court's order that they, like KCMSD here, did not seek in the first place, the appellees pointed out that the district judge had "learned a lot about public school education in Marion County in the thirty years that he has been presiding over this litigation." Id. The Seventh Circuit responded:

> [G]reat knowledge is a temptation as well as a resource: a temptation to blur the separation of powers, to shift the balance between the federal courts and state and local government too far toward the courts, and to disregard procedural niceties, all in fulfillment of a confident sense of mission.

Id.

Although the Seventh Circuit was dealing with expansion of a remedy and we deal with the elimination of one, the principle is the same: procedural niceties equate with due process and must be afforded the parties. As the Seventh Circuit vacated the

---

its usefulness. 128 F.3d at 510.

sua sponte order and remanded for the district court to hold an evidentiary hearing, so should we.

Counsel for KCMSD conceded that the court's ruling was on a ground not argued by the parties, but insisted that the court was thinking ahead of KCMSD. Having achieved its unexpected release from litigation, KCMSD hastens to give support to the ruling.

KCMSD argues that the district court did not err in declaring KCMSD unitary without benefit of notice, hearing, argument, or other evidentiary presentation. KCMSD cites Link v. Wabash Railroad Co., 370 U.S. 626 (1962), for the principle that "Parties are not always entitled to a hearing." Link has little, if any, relevance to this case. In Link, the district court set a pretrial conference and notified counsel. When the lawyer for the plaintiff did not appear at the time set, the court dismissed the action for failure to appear and failure to prosecute. Id. at 629. Link did no more than rule that the dismissal for failure to prosecute was not an abuse of discretion. Id. at 633.

Link is about sanctions, not about what opportunity parties should be given to present evidence and make argument before a ruling on the merits of their case. It certainly is not about the proper procedure for dismissal of a school desegregation case in which a school district has been adjudged liable for constitutional violations and subjected to a remedial decree. However, Link does have some general applicability to this case insofar as it discussed the circumstances that can justify entry of an order without the opportunity to be heard: "The adequacy of notice and hearing respecting proceedings that may affect a party's rights turns, to a considerable extent, on the knowledge which the circumstances show such party may be taken to have of the consequences of his own conduct." 370 U.S. at 332. Unlike Link, where the attorney had notice of the pretrial conference, and should have known that his failure to appear

would have consequences, in this case there was no notice to any of the parties, either constitutional violator or victims, that the issue of unitary status was to be considered and decided at the November hearing. To the contrary, there was every assurance that unitary status would not be considered until the scheduled January 2000 hearing, and KCMSD's requests for continuance strongly suggested that it would not even be in a position to contend that the district was unitary in January 2000. Link certainly demonstrates that simple fairness would require notice and hearing before a decision that dismisses the case.

At oral argument, KCMSD's counsel suggested that the Jenkins class had the opportunity to present evidence on the unitariness question at the hearing on the class's motion to stay the dismissal pending appeal. The opportunity to argue a stay motion, with the class having the burden on four discrete issues which placed the constitutional victims in the position of arguing that the horse should be put back in the barn, should not substitute for a chance to present evidence and argue the merits in a hearing called for that purpose.

The sua sponte ruling declaring the district unitary and releasing the admitted constitutional violator from further court supervision, without giving notice either to the constitutional violator or the victims or permitting the parties to present evidence and argue these issues, was error.

## II.

Although we do not reach the merits of the unitariness issue, we think it appropriate to comment on some issues the district court will face on remand.

The testimony at the hearing focused on the impact of the de-accreditation order, which Dr. John Murphy, a member of the DMC, described as a death knell, and Superintendent Benjamin Demps[6] described as a train wreck. Whatever description is applied, it was a resounding statement, of thunderclap proportions, that KCMSD had not been successful in dealing with the system wide reduction in student achievement, much less the achievement gap. In addition, there was considerable evidence about the effect of the establishment of some fifteen charter schools, unaccredited and not subject to state control, which had siphoned off more than 3,000 students from KCMSD. This resulted in KCMSD suffering a financial loss in the millions of dollars the law required be paid to the charter schools. These developments, the result of state action, have placed KCMSD in a most difficult situation, according to both Superintendent Demps and Dr. Murphy, in working to deal with the difficult educational problems KCMSD faces.

The district court commented that many of the hurdles that are presented to the plan and to unitary status are not constitutional violations. Order of November 17, 1999 at 36. This misses the point. Hurdles and obstacles to eliminating the vestiges of the past dual school system are properly the subject of attention by the court and may be addressed by injunctive order, if needed. Limitations on a school authority's discretion that impede the disestablishing of a dual school system must fall. North Carolina State Board of Educ. v. Swann, 402 U.S. 43, 45 (1971). This principle was applied earlier in this litigation to state action both by this court, Jenkins v. Missouri, 855 F.2d 1296, 1309-15 (8th Cir. 1988), aff'd in relevant part, 495 U.S. 33 (1990), and

---

[6]Superintendent Benjamin Demps, Jr. was hired as Superintendent of Schools as of August 1, 1999. The record demonstrates that there was considerable enthusiasm at his assuming the reins of leadership of KCMSD after a period of frequent replacement of Superintendents. Superintendent Demps had significant management experience in federal and state government.

the Supreme Court in <u>Jenkins v. Missouri</u>, 495 U.S. 33, 57-58 (1990). The court has the obligation to vindicate federal constitutional guarantees and to take what action is necessary for this purpose. <u>See</u> <u>Jenkins v. Missouri</u>, 495 U.S. at 57-58.

The district court expressed most positively that he was guided by the three-year limitation set by Judge Clark in March 1997, and he had adopted this as his own limitation as well. Judge Clark's order, however, while establishing the three-year limitation, was unable to say with absolute certainty that KCMSD would have attained unitary status in that time, and recognized that some thought five years might be needed. 959 F. Supp. at 1179. In affirming this order of Judge Clark's, we commented that the three-year time table was an optimistic prediction, <u>see</u> 122 F.3d at 601, and the figure was not susceptible of precise calculation. <u>Id.</u> at 602. It is significant that the three-year period has seen the termination of one superintendent of schools, the hiring of another, the later buyout of his contract, and the search for and hiring of the present superintendent.

Superintendent Demps stated that the district is currently undertaking efforts to reduce the achievement gap, which included instructional methodology and professional development, but he said this has not moved far since he came on board. Superintendent Demps further testified that the district is in the process of implementing the core curriculum; however, he had heard from Cheryl Shannon, Chief of Staff of KCMSD, that the curriculum was not aligned with the Missouri Show-Me Standards. There was a difference of opinion on this, and they were going to see to it that the court-ordered curriculum was properly aligned with the State's new Show-Me Standards.

Shannon stated that there was work remaining to be done toward implementation of the programs ordered to reduce the achievement gap. Implementation of the

professional development and assessment plans had begun, but there were hurdles remaining toward getting those plans up and running in part caused by vacancies in key positions. Further, the accountability plan had not been completely developed or accepted, and several scripts had not been developed, including those for teacher, principal, school, and central office evaluation. Shannon believed that the de-accreditation decision would risk further delay in implementing the various plans.

Superintendent Demps identified the accountability plan as a major part of the improvement program. Counsel informed this court at argument that not even a pilot program would be in place until the academic year 2000-01, and full implementation could not occur before the 2001-02 academic year. KCMSD's brief acknowledged that "teacher acceptance of the court-approved accountability plan is certain to be among the [topics for the] District's upcoming negotiations." A question obviously exists about not only the time frame, but also implementation of the accountability program.

It is also of significance that the March 27 termination of the desegregation monitoring committee and the de-accreditation effective date fall in the middle of the school year. Superintendent Demps expressed his deep concern about this, and we share this concern about the effect of an arbitrarily selected cut-off date bifurcating a school year.

The order of the district court in dismissing the action viewed the question as an all-or-nothing proposition. Yet, the Supreme Court has recognized that gradual and incremental withdrawal of the court's supervision may be most appropriate. See Freeman, 503 U.S. at 489 ("Partial relinquishment of judicial control, where justified by the facts of the case, can be an important and significant step in fulfilling the district court's duty to return the operations and control of schools to local authorities."). Counsel for the Jenkins class conceded in the August conference before the district

judge that the planning has been completed and he anticipates no suggestion of additional plans. What remains is the issue of the implementation of the plans in the five areas of curriculum, classroom practices, professional development, assessment, and accountability, all of which relate solely to the remedying of the system wide reduction in student achievement and the narrowing of the achievement gap. This concession significantly narrows the scope of the issues left for further judicial attention.

It should be observed that preparation of the plans, which requires effort by educational professionals, may be far simpler than implementation of the plans. This involves seeing that the plans ultimately have major impact in the classroom by teachers and administrators. The end result sought is an improvement in student achievement and reduction of the achievement gap. This is a people management issue requiring substantial effort and dedication, and one of great complexity.

We have affirmed and given our support to the district court in taking steps to improve student achievement and to reduce the achievement gap between black and white students in the Kansas City School District. Insofar as the Missouri State Department of Education shares this goal, it also has our support. Insofar as there may be conflicting goals between the State Department of Education and the district court orders, we believe that the district court should attempt to reconcile those goals so that impediments to the achievement of the goals are removed.

The limited scope of the remaining issues must be a key element in further consideration of this case by the district court. The district court must exercise its judgment and discretion, but it is our suggestion that the following issues be considered:

(1)  Determine whether immediate declaration of unitary status as to all issues in the case but the narrowing of the achievement gap is desirable.

(2)  The extent to which the district court's achievement standards and those of the State can be reconciled and a single clearly understood standard be developed by the court which is consistent with the State standard to the maximum extent practicable.

(3) Reevaluate appropriate procedures for monitoring or oversight of narrowing of the achievement gap.

    (a)  To what degree oversight is necessary.  That oversight should be narrowly tailored to successfully complete implementation of the five plans.

    (b)  Appropriate methods or procedures, be it the desegregation monitoring committee or some other instrumentality or method, for continuation of the monitoring or oversight.

    (c)  Evaluate and assess the implementation of the five plans, establishing a goal for achieving unitary status of each, and defining a state of implementation of the plans that will allow consideration as to whether there has been successful achievement of implementation.  This perhaps will require a determination as to whether a new and realistic time frame is desired.

(4) Consider most carefully the role of court oversight so as to complement and not conflict with the activities of the State with respect to educational improvement efforts.

We also believe the district court should view the role of further monitoring as a protective role, overseeing the superintendent's activities and his staff in achieving successful implementation of the plans. The district court recognized in particular the past micro-management, politicization and pursuing of personal agendas by the board. The district in its briefs to this court recognized the necessity for negotiation of the assessment and accountability plans with the American Federation of Teachers. In many of these areas such a role by judicial monitoring or oversight could lead to an earlier successful achievement of the implementation of these plans.

We reverse and remand for further proceedings consistent with this opinion. The judges of the Western District of Missouri should, in the manner they deem appropriate, designate another judge to preside over this litigation and do so immediately so as to assure continuity in its management. The mandate shall issue forthwith.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.