HEANEY, Circuit Judge,
with whom McMILLIAN, Circuit Judge, joins, concurring.
I wholly concur in Judge John R. Gibson’s well-reasoned opinion. Taking care to stay on the path established by the precedents of the United States Supreme Court and this court, Judge Gibson correctly holds that the students and parents of the KCMSD were denied due process when the district court declared the school district unitary without affording them notice or a hearing. I write separately to express more fully my reasons for agreeing with the majority opinion and to correct the revisionist history painted by Judge Beam’s dissent.
The Kansas City schools remained segregated until 1986. In that year, we approved a plan to desegregate them after more than forty-five years of slavery— when the state forbid the education of blacks, see Laws of the State of Missouri, 14th General Assembly, 1st Session at 104 (Jefferson City 1847) — and 120 years of segregation — when public schools for black students were not only separate, but inferior to those for white students, see Brown v. Board of Educ., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). We believed that if the court-ordered plan was fully and faithfully implemented, white city students who attended private and parochial schools would return to the public school system, and white suburban students would be attracted to integrated magnet schools to be established in the city. Importantly, we also stated that a voluntary interdistrict transfer program similar to that in St. Louis should be implemented in Kansas City.
As a result of the 1986 decrees, the facilities have improved, more books and teaching aids are available, class size has been reduced, remedial and compensatory educational programs have been funded and implemented, and educational opportunities for black and white students alike have improved. Although Kansas City’s public schools have improved, they would be better had the State and the KCMSD promptly complied with the Supreme Court’s unanimous instruction in 1955 to “desegregate with all deliberate speed,” id. at 301, 75 S.Ct. 753, or with the Supreme Court’s unanimous opinion in 1968 “that the time for mere deliberate speed has run out .... The burden on the school board today is to come forward with a plan that promises realistically to work and promises realistically to work now,” Green v. County Sch. Bd., 391 U.S. 430, 438-39, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Moreover, the State and the KCMSD could have ensured further improvement for the schools had they promptly and positively *729 complied with the district court’s 1986 desegregation orders.[8]
The fact is that 165 years of racial discrimination simply could not be overcome in fourteen short years of court supervision, particularly without the full cooperation of the State, the KCMSD, and the suburban schools. Over this period, none of these entities made any effort to implement a voluntary interdistrict transfer program, thus preventing complete integration of the Kansas City schools.[9] Further, the State Board of Education took no responsibility for the KCMSD’s performance, and never once during the fourteen-year period moved to implement the quality education programs called for in Judge Clark’s plan. It simply complied with the district court’s funding orders. In addition, the constant bickering between the State and the KCMSD and the numerous changes in leadership in the Kansas City schools obviously did not inspire community, parental, or student confidence in the school district.
There is no doubt that the KCMSD currently is faced with more than its fair share of difficulties — difficulties brought on in large measure by the State. Shortly after receiving a judgment declaring that it had satisfied its obligations and being dismissed from this case, the State took two dramatic actions that will impair the KCMSD’s ability to provide a quality education for its students. First, it authorized the creation of charter schools in St. Louis and Kansas City, and second, it de-accred-ited the Kansas City schools effective May 1, 2000 because students have done poorly on student achievement tests.
It is, of course, appropriate for the State to create charter schools, but it is difficult to understand why it authorized the creation of these schools only in the state’s two largest cities, both of which enroll a large majority of black students. Additionally, the KCMSD is required to pay *730 the cost of educating and transporting the students who attend these schools. As a result, Kansas City’s public schools will have a more difficult time providing the trained teachers, the educational programs, and the materials necessary to ensure improved achievement of those students, overwhelmingly black, who remain in the public schools.[10]
To make matters worse, the de-accredi-tation of the KCMSD allows students to attend schools in any other district within the state at the KCMSD’s expense. It is noteworthy that the State, which has opposed interdistrict transfers over the past fourteen years, now suddenly approves of such transfers. The only logical explanation for the State’s sudden change of heart is that the cost of transfers must now be paid by the KCMSD rather than the State, There is also a serious question as to whether the suburban schools will accept large numbers of Kansas City’s black students.
Before concluding, I must take issue with some of the comments in Judge Beam’s dissent. First, his assertion that “[sjtudent scores as measured by routine and regularly administered standardized tests have remained static or have declined” is unfounded. From 1987 to 1994, KCMSD student test scores not only improved in most grades, but significantly improved. In 1995, however, the test scores dropped, resulting in those cited by Judge Beam. The reasons for the decline are unexplained in the record and may be explored during the unitary status hearing. Below is a comparison of the test scores from 1988 to 1994.
[[Image here]]
*731 Second, Judge Beam states that KCMSD “students remain as racially isolated as when the first remedial order was entered.” He notes that in 1986 twenty-five schools had a 90%+ minority enrollment, and in 1999, that number had increased to twenty-seven. His statements are misleading. The number of racially-isolated schools in the KCMSD decreased from twenty-five in 1986 to sixteen in 1996. See KCMSD Student Census Count (Sept. 25, 1996; Jan. 29, 1997; Sept. 24, 1997; Jan. 28, 1998; Sept. 30, 1998; Jan. 27, 1999). Only in the past three years has the number of racially-isolated schools jumped from sixteen to twenty-seven, a 69% increase. Such a substantial increase may indicate that the KCMSD is in the process of resegregating itself.
Third, Judge Beam asserts that $2 billion in tax dollars has been spent since 1985 to fund the plan to desegregate the Kansas City schools. Accepting the validity of that statement for the purpose of this concurring opinion, I note that over the fourteen-year period, the State and the KCMSD spent an average of $142,800,000 per year or approximately $3,900 per pupil. Of this sum, Kansas City contributed approximately $417 million or $833 per pupil per year.
This expenditure by the State and the KCMSD to desegregate Kansas City’s schools must be viewed in context., As previously noted, black children were denied any education for forty-five years and were provided an inferior, segregated education for 120 years. Although the precise dollar amount is not contained in the record, it is clear that both the State and the KCMSD saved hundreds of millions of dollars during the slavery and segregation periods. The expenditures for desegregation must be balanced against the savings made over 165 years.
Of all the conclusions reached by Judge Beam in his dissent, the most disturbing is that it is beyond the KCMSD’s power, with or without the cooperation of the Missouri State Board of Education, to close the achievement gap between black and white students even to the modest degree required by the district, court and now required by this court. The fact of the matter is that achievement levels of Kansas City’s black students have improved and will continue to improve as long as the State and the KCMSD understand that it is their responsibility to do everything reasonably practicable to achieve this result.
As the Supreme Court made clear in Board of Educ. v. Dowell, 498 U.S. 237, 247, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), withdrawal of federal supervision requires not only compliance with the commands of the Equal Protection Clause, but also a showing “that it [is] unlikely that the Board [will] return to its former ways.” Thus to achieve unitary status, the KCMSD must demonstrate not only that it has eliminated racial isolation to the extent practicable, see Missouri v. Jenkins, 515 U.S. 70, 90, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995), but also that it will maintain those gains when the litigation ends. Absent a unitary status hearing, it could not be determined whether the KCMSD has met these requirements.
No one knows what will occur next, but one thing is certain: Kansas City needs good public schools that offer all students, black or white, rich or poor, a good education. Without a good public school system, all of Kansas City will suffer-the community, the parents, and most of all the students who deserve an education which will enable them to be productive citizens. If the State of Missouri now believes that the KCMSD is not capable of operating the Kansas City schools, it can and should take over the schools and try its hand at giving the students a quality desegregated education. If the State is unwilling to do so-and to this point it has been-it should not penalize the students by dismantling the KCMSD. Rather the State should find a way to work with the KCMSD to *732 improve education and provide the resources necessary to achieve that end.
JOHN R. GIBSON,
Circuit Judge, with whom HEANEY and McMILLIAN, Circuit Judges, join, writing separately.
I write separately in concurrence to expand upon the statement that appears in footnote 6 of the court’s opinion and to respond to the dissents.
Both dissents argue that the district court failed to follow the ruling of the Supreme Court in Missouri v. Jenkins, 515 U.S. 70, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (Jenkins III). The district court specifically referred to the directions in Jenkins III that it should “decide whether the reduction in achievement by minority students attributable to prior de jure segregation has been remedied to [the] extent practicable” and identify the “incremental effect that segregation has had on minority student achievement or the specific goals of the quality education programs.” Jenkins v. Missouri, 959 F.Supp. 1151, 1155 (W.D.Mo.) (quoting Jenkins III, 515 U.S. at 101, 115 S.Ct. 2038), aff'd, 122 F.3d 588 (8th Cir.1997) (Jenkins XIV).
Judge Beam asserts that “Jenkins III does not authorize a purported achievement gap as a vestige.” Infra at 736-37. In fact, Jenkins III neither “authorizes” nor forbids reliance on this type of vestige; rather, it tells us to look at the evidence in the case to determine what part of the gap (if any) was caused by the constitutional violation. See 515 U.S. at 101, 115 S.Ct. 2038. Judge Clark so found, 959 F.Supp. at 1157-65, and we held his findings were not clearly erroneous. See Jenkins XIV, 122 F.3d at 597-99. Jenkins XIV is thus the law of the case.
Judge Clark’s order faithfully followed Jenkins III.
KCMSD does not now ask us to reconsider Jenkins XIV, nor did the present district judge suggest that he was reconsidering it or applying any exception to the law of the case doctrine. Further, when the case was before us in 1997, KCMSD sought and supported the ruling that the achievement gap was a vestige of segregation. In its Jenkins XIV brief, KCMSD stated: “KCMSD’s expert, whom the court declared credible, established the causal connection between de jure segregation and current minority student achievement.” Brief at 36. “KCMSD presented substantial evidence that the student achievement vestige continues, consistent with Jenkins III standards.” Brief at 35. KCMSD benefitted from the Jenkins XIV ruling, which allowed it to retain the $4.96 tax levy imposed to fund the remedy for the continuing constitutional violation. See 959 F.Supp. at 1154-55. KCMSD, having sought that ruling and having enjoyed the benefits of it, does not now seek to repudiate it.
Judge Loken states that Judge Clark “did not make the critical finding that any achievement gap among students within the KCMSD was also a vestige of discrimination with a causal link to the de jure violation being remedied.” Infra at 743 (internal quotation omitted). Judge Clark stated: “The Court finds that Dr. Trent’s test is reliable and accurately identifies the incremental portion [of the achievement gap] attributable to the prior de jure discrimination.” 959 F.Supp. at 1164. Later, in summing up his findings, Judge Clark wrote: “The Court has found that 13% of the initial gap and 13% of the increase in the gap may be traced to the prior discrimination within the KCMSD.” Id. at 1165.
Judge Loken contends that Judge Clark should not have imposed the burden of proof on the constitutional violators to show that the achievement gap was not caused by the constitutional violations. This burden of proof question was fully considered and decided in our 1997 opinion. See Jenkins XIV, 122 F.3d at 593-95. In KCMSD’s brief filed with this court in 1997, it argued that “[t]he burden of demonstrating ... that unitary status exists, rests squarely with the constitutional viola *733 tor.” Brief at 29. Although this argument dealt with the State as a constitutional violator, KCMSD has admitted that it is also a constitutional violator and that the burden of proof rests with it. At no point in the proceedings below or in this court has KCMSD taken any position other than that it bears the burden of proof to demonstrate unitary status.

. Among the programs approved by the district court and this court were library, teaching load, and curriculum improvements; additional counselors; summer school programs; full-day kindergarten; before and after school tutoring; and early childhood development programs. Also approved were a student achievement program and a class size reduction. The programs were designed to remedy the effects of the dual system and to bring about systematic educational improvements. Jenkins v. Missouri, 807 F.2d 657, 682-83 (8th Cir.1986) (en banc) (Jenkins I).

. In Jenkins I, we stated:
A voluntary interdistrict transfer program is one that has great potential for improving the racial balance in the Kansas City area. The experience in St. Louis with such a plan seems to have been favorable. The district court is correct in its holding that such a program cannot be mandatorily imposed upon the record before the court. Whether a refusal of a district to participate in such a voluntary program may evidence discriminatory intent and thus be an independent basis for further relief and mandatory participation is an issue that we should not anticipate.
807 F.2d at 683 n. 30. In his concurrence, Judge Arnold stated:
I would hold that the District Court erred in concluding that the SSDs cannot be required to participate in an interdistrict remedy for interdistrict school segregation caused by the State’s constitutional violations in the area of housing. The case should be remanded to the District Court for determination of the current interdis-trict effects, if any, of the State’s housing violations. Any SSDs implicated by this analysis should be obliged to participate in an appropriately tailored interdistrict remedy-
Id. at 687 (Arnold, J., concurring). Furthermore, Judge Ross stated:
At the time of argument it was my understanding that a voluntary interdistrict program, patterned along the lines of the St. Louis program was a real possibility. It would now appear that some of the districts are not moving forward with this plan.
In my opinion the failure to organize and implement this program would be a very significant factor in determining discriminatory intent in the future litigation which is certain to result from the further processing of this case. The St. Louis program would be a useful model for the actions to be taken by all the Missouri districts which are parties to this action.
Id. (Ross, J., concurring).

. If the number of Kansas City public school children enrolled in the charter schools remains constant in FY 2001, the KCMSD will be limited to spending $8,240 per pupil unless it is able to raise additional money through local taxation. (J.A. at 1041.) Moreover, witnesses for the KCMSD testified that they expect 3,200 pupils to transfer to other districts at a total cost to the KCMSD of $35,892,000. (J.A. at 1043.) If this number of students transferred, the KCMSD will have just $7,450 per pupil available to educate its remaining 28,000 students. (J.A. at 1045.)
Contrary to Judge Beam's assertion that Kansas City per pupil spending is well above that spent by any other school district in Missouri, the fact is that in the 1998-99 school year, the last year for which statistics are available, several school districts in the State of Missouri expended more per pupil than did the KCMSD, including Brentwood, $8,735; Clayton, $11,239; Ladue, $9,938; and Center, $8,583. See Office of Social and Economic Data Analysis, University of Missouri, <http://www.oseda.missouri.edu/coun-typage>. Since the 1994-95 school year, KCMSD’s per pupil spending has declined by 21%, while per pupil spending in the above-cited school districts increased on average 19.5%. See id.